MILLER NASH LLP
Bernie Kornberg, Bar No. 252006
bernie.kornberg@millernash.com
KC Hovda (*Pro Hac Vice Forthcoming*)
kc.hovda@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone:    562.435.8002
Facsimile:    562.435.7967

Attorneys for Defendant
Live Oak Banking Company

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 31014 UNION CITY BLVD LLC, a California limited liability company; and UNION CITY VETERINARY CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE OAK BANKING COMPANY, a North Carolina Corporation, and Does 1 through 100,<br><br>Defendants. | Case No. 4:26-cv-03958-KAW<br><br>**LIVE OAK BANKING COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: June 18, 2026<br>Time: 1:30pm<br>Courtroom: TBD<br>Judge: Magistrate Judge Kandis A. Westmore |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 18, 2026, at 1:30pm, in a to-be-determined Courtroom of the above-entitled Court, Defendant Live Oak Banking Company ("Live Oak") will and hereby does move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all causes of action in the First Amended Complaint ("FAC") filed by Plaintiffs 31014 Union City Blvd LLC and Union City Veterinary Corporation (collectively, "Union"). The FAC is available Dkt. No. 1-1 at 18-27.

Live Oak respectfully requests that the Court enter an order dismissing each of the five causes of action in the FAC—for breach of written contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, and unfair and deceptive trade practices— with prejudice and without leave to amend.

This motion is based on this Notice, the Memorandum below, the FAC, the Loan Agreement, the SBA 7(a) Loan Authorization, and the January 23, 2023 email chain incorporated by reference into the FAC and attached to the Declaration of Keilah Spooner ("Spooner Decl."), the Court's files, and argument at hearing.

Dated: May 8, 2026

MILLER NASH LLP


By: */s/ Bernie Kornberg*
Bernie Kornberg
KC Hovda (*Pro Hac Vice Forthcoming*)

*Attorneys for Defendant*
*Live Oak Banking Company*

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND .......................................................................................................... 2

   A.   The Loan Agreement Governs the Parties' Relationship and Expressly Limits Lender Responsibility. ....................................................................................................... 2

   B.   The FAC Alleges That Live Oak Should Not Have Approved a Construction Draw—But the Full Email Selectively Quoted in the FAC Shows That Live Oak Properly Obtained Approval For the Draw. ....................................................................... 4

III.  ARGUMENT ................................................................................................................ 5

   A.   The Loan Agreement and the Full Text of the January 23, 2023 Email Should Be Considered and Are Independently Dispositive. ........................................................ 5

     1.   The Court Should Consider the Loan Agreement and the Full January 23 Email Under the Incorporation-by-Reference Doctrine. ....................................... 6

     2.   The Loan Agreement's Liability Limitation is Enforceable and Bars All Claims. ..... 8

     3.   The Full Text of the January 23, 2023 Email Disproves Union's Theory of the Case. ............................................................................................................... 10

   B.   Union Fails to Plausibly Allege a Breach of Contract. .................................................. 10

   C.   The Implied Covenant of Good Faith and Fair Dealing Claim Is Duplicative and Fails. ................................................................................................................. 12

   D.   The Fraud Claim Fails to Satisfy Rule 9(b) and Fails on the Merits. ........................... 13

     1.   The FAC Does Not Meet Rule 9(b)'s Particularity Requirements. ........................... 13

     2.   The FAC Identifies No Actionable Misrepresentation. ........................................... 14

     3.   Union Cannot Plead Justifiable Reliance. .............................................................. 14

   E.   The Negligent Misrepresentation Claim Is Barred by the Economic Loss Rule and Fails for Lack of a Duty of Care and Justifiable Reliance. ..................................... 15

     1.   The Economic Loss Rule Bars This Claim. ............................................................ 15

     2.   Union Cannot Establish Justifiable Reliance ........................................................ 16

     3.   Union Has Failed to Show That Live Oak Owed It a Duty of Care. ........................ 16

   F.   The UDTPA Claim Fails on Multiple Independent Grounds. ......................................... 17

     1.   The Economic Loss Rule Independently Bars the UDTPA Claim. .......................... 18

     2.   Union's Misrepresentation Theory Fails for Lack of Reasonable Reliance. ............ 19

     3.   Union's Failure-to-Disclose Theory Fails for Lack of a Duty to Disclose. ............... 19

     4.   The Remaining Allegations Fail for Lack of Proximate Causation. ......................... 20

VI.   CONCLUSION .............................................................................................................. 21

LIVE OAK'S MOTION TO DISMISS

4923-9064-5921.9

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ace, Inc. v. Maynard*,
108 N.C. App. 241 (1992)........................................................................................... 15, 16

*Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*,
368 N.C. 440 (2015) ...................................................................................................... 14

*Box Co. of Am., LLC v. Bostick*,
No. 25CV003154-000, 2025 WL 3633645 (N.C. Super. Dec. 15, 2025)................................ 12

*Bumpers v. Cmty. Bank of N. Va.*,
367 N.C. 81 (2013) ........................................................................................................ 19

*Carlson v. Branch Banking & Trust Co.*,
123 N.C. App. 306 (1996).................................................................................................. 9

*Camp v. Leonard*,
133 N.C. App. 554 (1999).................................................................................................. 9

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997)......................................................................................... 6, 7

*Cordaro v. Harrington Bank, FSB*,
260 N.C. App. 26 (2018)........................................................................................ 12, 14, 20

*Cross v. Formativ Health Mgmt., Inc.*,
439 F. Supp. 3d 616 (E.D.N.C. 2020)........................................................................ 15, 18, 21

*Dairy Road Partners v. Maui Gas Ventures LLC*,
2018 WL 3945373 (D. Haw. 2018) ................................................................................. 6, 7

*Dallaire v. Bank of Am., N.A.*,
367 N.C. 363 (2014) ................................................................................................. 16, 20

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010)......................................................................................... 6, 7

*Defeat The Beat, Inc. v. Underwriters At Lloyd's London*,
194 N.C. App. 108 (2008)............................................................................................... 17

*Forest2Market, Inc. v. Arcogent, Inc.*,
2016 WL 56279 (N.C. Super. Ct. Jan. 5, 2016)............................................................... 15, 16

*Gray v. N.C. Ins. Underwriting Ass'n*,
352 N.C. 61 (2000) ....................................................................................................... 17

*James B. Taylor Fam. Ltd. P'ship v. Bank of Granite*,
  234 N.C. App. 478, 2014 WL 2777492 (June 17, 2014) ........................................................ 12

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................................................. 6, 7, 8

*Kron Medical Corp. v. Collier Cobb & Assocs., Inc.*,
  107 N.C. App. 331 (1992) ..................................................................................................... 19, 20

*Kuhlmann v. Sabal Financial Group LP*,
  26 F. Supp. 3d 1040 (W.D. Wash. 2014) ............................................................................. 8, 9

*Lassiter v. Bank of North Carolina*,
  146 N.C. App. 264 (2001) ..................................................................................................... 9, 15

*Maglione v. Aegis Fam. Health Centers*,
  168 N.C. App. 49 (2005) ....................................................................................................... 13

*Mauro v. Mooney*,
  210 N.C. App. 759, 2011 WL 1238427 (April 5, 2011) ........................................................ 13

*McDonald v. Bank of New York Mellon Tr. Co., Nat'l Ass'n*,
  259 N.C. App. 582 (2018) ..................................................................................................... 10

*Mitchell v. Linville*,
  148 N.C. App. 71 (2001) ....................................................................................................... 17

*Nedlloyd Lines B.V. v. Superior Ct.*,
  3 Cal. 4th 459 (1992) ........................................................................................................... 3

*Perry v. Carolina Builders Corp.*,
  128 N.C. App. 143 (1997) ..................................................................................................... 17

*Rosen v. Club at Longview, LLC*,
  263 N.C. App. 410, 2018 WL 6614054 (December 18, 2018) ............................................... 19

*Suntrust Mortg., Inc. v. Busby*,
  651 F. Supp. 2d 472 (W.D.N.C. 2009) ................................................................................. 15, 16

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ................................................................................................. 13

*Thompson v. Bass*,
  261 N.C. App. 285 (2018) ..................................................................................................... 10

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ............................................................................................... 13

*Walker v. Sloan*,
  137 N.C. App. 387 (2000) ..................................................................................................... 20

LIVE OAK'S MOTION TO DISMISS

**Statutes**

N.C. Gen. Stat. § 75-1.1 .......................................................................................................... 2, 5

**Other Authorities**

Rule 9(b) ..................................................................................................................... 1, 2, 13

Rule 12(b)(6) ...................................................................................................................... 7

- iv -                                        LIVE OAK'S MOTION TO DISMISS

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Union's claims against Live Oak fail as a matter of law.  Live Oak and Union entered into a written Loan Agreement for construction of a veterinary hospital (the "Project") with a maximum loan disbursement amount of $3,790,000 (the "Loan Agreement").  Under the Loan Agreement, Live Oak would make disbursements directly to Union's general contractor for the Project.  Union now brings five claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, and (5) unfair and deceptive trade practices.  Each claim is premised on the theory that Live Oak should not have approved the first construction draw under the Loan Agreement that included a $220,189 "mobilization" charge.

But the very email that Union relies upon in the FAC[1] tells a different story: Live Oak's construction specialist expressly flagged the mobilization line item, noted it was unusually high, disclosed that backup documentation was limited, and asked Union to decide whether to authorize the draw despite that risk.  Union did just that.  Moreover, the Loan Agreement contains an express "LIMITATION OF LENDER RESPONSIBILITY" clause (Section 9.13) that (i) bars Union from relying on Live Oak's determination of the appropriateness of any disbursement, (ii) provides that no disbursement constitutes an approval or representation of any kind, and (iii) confirms any inspection/approval is solely for Live Oak's protection.  Together, the email and Section 9.13 are fatal to every claim in the FAC.

The claims also all fail for additional, independent reasons.  The breach of contract claim does not (and could not) identify any specific contractual provision that Live Oak breached, particularly in light of the Loan Agreement's integrated-agreement and amendment provisions (Sections 8.1 and 8.2).  The claim for breach of the implied covenant of good faith and fair dealing is duplicative of the contract claim and fails for the same reasons.  The fraud claim does not satisfy Rule 9(b)'s heightened pleading standard and fails to plead justifiable reliance on any actionable misrepresentation, especially given Section 9.13's express no-reliance/no-representation language and Section 8.13's "NO FIDUCIARY RELATIONSHIP" clause.  The negligent misrepresentation

---

[1] The FAC is available Dkt. No. 1-1 at 18-27.

claim is barred by the economic loss rule and fails because Union has not and cannot plead that Live Oak owed it a duty of care or that it justifiably relied on Live Oak's alleged misrepresentations. Finally, the claim based on North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 (the "UDTPA") fails on multiple grounds, including the economic loss rule and Union's failure to plausibly plead reasonable reliance, a duty to disclose, and causation. Because the defects in Union's claims cannot be cured by amendment, Live Oak respectfully requests that the Court dismiss the FAC with prejudice.

## II.     STATEMENT OF ISSUES

1.     Whether Union's cause of action for breach of contract states a claim upon which relief can be granted.

2.     Whether Union's cause of action for implied covenant of good faith and fair dealing states a claim upon which relief can be granted.

3.     Whether Union's cause of action for fraud fails to satisfy Rule 9(b)'s heightened pleading standard and fails to state a claim upon which relief can be granted.

4.     Whether Union's cause of action for negligent misrepresentation fails to state a claim upon which relief can be granted.

5.     Whether Union's cause of action for violation of the UDTPA fails to state a claim upon which relief can be granted.

## II.     BACKGROUND

### A.     The Loan Agreement Governs the Parties' Relationship and Expressly Limits Lender Responsibility.

On or about November 5, 2021, Union executed the Loan Agreement with Live Oak for the Project. FAC ¶¶ 7–8. Under the Loan Agreement, Live Oak agreed to loan Union the sum of $3,790,000. Spooner Decl., Ex. A at § 1.1. The Loan Agreement is an integrated contract that "constitute[s] the entire understanding and agreement of the parties" and "supersede[s] all prior

statements, agreements and understandings." Spooner Decl., Ex. A at § 8.1. The Loan Agreement is governed by North Carolina law. *Id.* at § 8.4.[2]

The purpose of the loan was for Union to purchase certain real property located at 31014 Union City Boulevard, Union City, California and to renovate the building on which the property was located. Spooner Decl., Ex. B at § G. Sections 9.4 and 9.5 of the Loan Agreement set out the draw request and disbursement process for the renovations. *Id.* at §§ 9.4–9.5. Under the Loan Agreement, Union, as the borrower, and Regency General Contractors Inc. ("Regency"), as the general contractor, were jointly responsible for ensuring that draw requests were properly submitted. *Id.* at § 9.4.

When Union wanted a loan disbursement, Union and Regency were required to complete a draw request "in form and substance satisfactory to Lender" and supported "by such evidence as Lender shall reasonably require." *Id.* Union, as the borrower, agreed to "only submit a Draw Request with respect to work actually completed by the General Contractor in a good and workmanlike manner and for materials and equipment actually incorporated into the Premises in accordance with the Plans and Specifications." *Id.* Upon "receipt of an approved Draw Request along with all supporting documentation required by this Agreement," Live Oak was required to make a disbursement within 10 days. *Id.* at § 9.5. Union also authorized Live Oak "to make any Disbursement in the manner required by Lender in its sole and absolute discretion" including direct payments to the general contractor, Regency, or subcontractors. *Id.* at § 9.5.

Critically, Section 9.13 of the Loan Agreement, titled "LIMITATION OF LENDER RESPONSIBILITY," provides:

> *Neither Borrower* nor the General Contractor or any contractor, subcontractor, materialman, laborer, *or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Disbursement.* The making of any Disbursement by Lender shall not constitute or be interpreted as either (i) an approval or acceptance by Lender of the work done through the date of the Disbursement; or (ii) a representation or indemnity by Lender to any party against any deficiency or defect in

---

[2] This motion assumes that North Carolina law applies to all claims in the FAC. Under California law, a valid contractual choice-of-law clause extends not only to breach of contract claims but also to all tort claims that arise from or relate to that agreement "or the legal relationships it creates." *See, e.g., Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992).

the work or against any breach of any contract. *Lender's* inspection and *approval of the Construction in accordance with the Plans and Specifications are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party.*

*Id.* at § 9.13 (emphasis added).

The loan provided for under the Loan Agreement was guaranteed by the U.S. Small Business Administration ("SBA"). Union alleges that the SBA issued a 7(a) Loan Authorization ("SBA Authorization") on September 9, 2021, and that the SBA Authorization was "expressly incorporated" into the Loan Agreement. FAC ¶¶ 7–9. But the SBA Authorization expressly states it is "between Lender and SBA and creates no third party rights or benefits to Borrower," which forecloses any attempt to convert SBA lender-facing conditions into borrower-enforceable duties. Spooner Decl., Ex. B at § 7(a)(1)(A).

### B.    The FAC Alleges That Live Oak Should Not Have Approved a Construction Draw—But the Full Email Selectively Quoted in the FAC Shows That Live Oak Properly Obtained Approval For the Draw.[3]

On September 21, 2022, Union entered into a construction contract with Regency as general contractor to complete the Project. FAC ¶ 12. Union alleges that shortly after entering into the construction contract, Regency submitted "Payment Application #1" to Live Oak, requesting a disbursement from the loan in the amount of $385,031.25, including a $220,189 line item for "mobilization." FAC ¶ 14. That Payment Application remained under review for months, and according to the FAC was not approved until the end of January 2023. *See* FAC ¶ 29.

The FAC also alleges that in October 2022, Live Oak appointed Charlie Lehmann as a construction specialist overseeing the Project and Loan Agreement. FAC ¶ 26. Union alleges that on December 22, 2022, presumably in connection with reviewing Payment Application #1, Lehmann stated Live Oak was "keeping [Union] in mind by requesting these backup items to confirm pricing for [payments that are] being requested" and would "make sure everything is accurate." FAC ¶ 28. Then, on January 23, 2023, Lehmann emailed Union requesting "approval

---

[3] The allegations in the FAC are taken as true for purposes of this motion only.

- 4 -                    LIVE OAK'S MOTION TO DISMISS

on releasing funds to Regency" and stating that Live Oak had "received the majority of the backup documents" it was looking for.  FAC ¶ 29.

However, the full text of the January 23 email—which the FAC quotes only in part—tells a materially different story.  In that email, Lehmann expressly flagged the mobilization line item at issue in the FAC, stating:

> We did want to make sure you all were aware of the mobilization line item being billed for $220,189.00.  This is higher then we typically see mobilization fees and wanted to get it on your radar for approval.
>
> This is the one item we did not receive too much backup documents for and just wanted you all to be aware.

Spooner Decl., Ex. C.

Lehmann then asked Union to "approve/confirm total payment" and stated "[p]lease let me know if you have any questions at all."  *Id.*  Two days later, Union's representative responded: "I approve the $385,031.25 payment to Regency."  *Id.*  Far from concealing the mobilization charge or the limited backup documentation, the full text of the email relied upon in the FAC indicates that Live Oak disclosed both facts and placed the decision with Union—who approved the payment notwithstanding the warning.  *Id.*

Based primarily on Live Oak's approval of Payment Application #1, Union asserts five causes of action in the FAC: (1) breach of written contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) negligent misrepresentation; and (5) unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1.  Union seeks $14,210,831 in compensatory damages, plus treble damages.  FAC, Prayer.

## III.    ARGUMENT

### A.    The Loan Agreement and the Full Text of the January 23, 2023 Email Should Be Considered and Are Independently Dispositive.

Every claim in the FAC rests on the same core theory: that Live Oak bore responsibility for evaluating the adequacy of Regency's documentation and the propriety of Payment Application #1, and that Live Oak's approval of that disbursement constituted a representation that the documentation was sufficient and the charges were valid.  *See* FAC ¶¶ 15–17 (breach of contract);

- 5 -                                LIVE OAK'S MOTION TO DISMISS

4923-9064-5921.9

¶ 23 (good faith and fair dealing); ¶¶ 30–32 (fraud); ¶ 40 (negligent misrepresentation); ¶¶ 43–44 (UDTPA).  But the Loan Agreement squarely rejects that allocation of responsibility: it is Union's obligation to submit a draw request only for work actually completed/materials incorporated (Section 9.4), and Section 9.13 bars any reliance on Live Oak's disbursement determinations and disclaims any representation or approval.  The full text of the January 23, 2023 email reinforces the point by expressly warning Union of the unusually high mobilization charge and limited backup documentation while requesting Union's approval.  Those documents are fatal to Union's theory.

**1.    The Court Should Consider the Loan Agreement and the Full January 23 Email Under the Incorporation-by-Reference Doctrine.**

Live Oak requests that this Court consider in deciding this motion the Loan Agreement (Spooner Decl., Ex. A), the SBA Authorization (Spooner Decl., Ex. B), and the January 23, 2023 email chain (Spooner Decl., Ex. C.).  The Court may do so under the incorporation-by-reference doctrine.

On a motion to dismiss, the court may consider documents incorporated by reference into the complaint.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir.  2018).  The incorporation-by-reference doctrine permits the court to consider documents that are (1) referenced in the complaint, (2) central to the plaintiff's claims, and (3) whose authenticity is not disputed.  *Daniels-Hall v. Nat'l Educ.  Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  Where the complaint quotes a document only in part, the court may consider the full text.  *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997).  This principle applies with particular force where a plaintiff selectively quotes a document in the complaint to create a misleading impression.  *See Dairy Road Partners v. Maui Gas Ventures LLC*, 2018 WL 3945373, at *7–8 (D. Haw.  2018) (considering full email record where complaint "simply omit[ted]" portions contradicting plaintiff's claims); *Khoja*, 899 F.3d at 1002 (explaining that the incorporation-by-reference doctrine serves to prevent plaintiffs from selectively citing portions of documents that support their claims while omitting portions that undermine them).

The Loan Agreement is properly before the Court on this motion because the FAC repeatedly references it as the governing contract and bases every cause of action upon it.  FAC

- 6 -                          LIVE OAK'S MOTION TO DISMISS

¶¶ 8–11, 13, 17–19, 21–24.  The Loan Agreement is thus "central to" Union's claims, and its authenticity is not in question.  *Daniels-Hall*, 629 F.3d at 998.  Similarly, Union alleges that the SBA Authorization "memorializes SBA's approval of the Loan with Live Oak Bank – the originating and servicing lender – and sets mandatory SBA terms and conditions governing the Loan and the Project."  FAC ¶ 7.  Accordingly, both the Loan Agreement and SBA Authorization form the basis of Union's claims and thus are incorporated by reference into the Complaint.

The Court should likewise consider the full text of the January 23, 2023 email chain.  The FAC selectively quotes from this email at paragraphs 29–30, characterizing it as a representation that Live Oak had "received the majority of the backup documents [they] were looking for."  FAC ¶ 29.  But the FAC omits the critical remainder of the email in which Lehmann expressly disclosed the mobilization charge, warned it was unusually high, noted the lack of full backup, and asked Union for its approval.  *See* Spooner Decl., Ex. C.  Because the FAC "quotes only in part" from this email, the Court may—and should—consider the full text.  *Cooper*, 137 F.3d at 623.  This case presents precisely the situation the incorporation-by-reference doctrine is designed to address.  In *Dairy Road Partners*, the court considered a full email record where the amended complaint selectively quoted from correspondence to construct a misleading fraud narrative.  2018 WL 3945373, at *7–8.  The court held that the full record of email correspondence was incorporated by reference because the complaint "necessarily relie[d] upon" it and because the plaintiff had engaged in a "transparent attempt to survive Rule 12(b)(6)" by "simply omit[ting]" portions that contradicted its claims.  *Id.*  Here, the FAC's selective quoting of the January 23 email is the same kind of "subterfuge" critiqued by the *Dairy Road Partners* court.  *Id.* at *7.

The Ninth Circuit's analysis in *Khoja* confirms that the January 23, 2023 email should also be considered because it forms the basis of Union's claims.  In *Khoja*, the court evaluated several documents that the defendant sought to incorporate and affirmed incorporation for those documents that were either quoted extensively in the complaint or "form[ed] the basis" of the plaintiff's claims.  899 F.3d at 1002.  The *Khoja* court's treatment of any reports that allegedly contained misrepresentations is particularly instructive.  The court affirmed incorporation of reports that allegedly contained misrepresentations because they "form[ed] the basis" of the

- 7 -                              LIVE OAK'S MOTION TO DISMISS

plaintiff's theory. *Id.* at 1005.  Like the reports in *Khoja*, the January 23, 2023 email contains some of the very statements Union identifies as alleged misrepresentations.  *See* FAC ¶¶ 29–30.  Accordingly, the email does not merely discuss the same subject matter as the FAC; it *is* the subject matter—the document that "forms the basis" of the claims.  899 F.3d at 1002.

In sum, the Court can and should consider the complete January 23 email and the full text of the contract that forms the basis of Union's claim.

> **2.      The Loan Agreement's Liability Limitation is Enforceable and Bars All Claims.**

Section 9.13 of the Loan Agreement expressly negates Union's theory of the case multiple times over by providing that: (1) Union had no "right to rely" on Live Oak's determination of the "appropriateness of any Disbursement"; (2) any disbursement "shall not constitute or be interpreted" as an approval of work or a representation against deficiencies; and (3) any approvals are "solely for the protection of Lender's interests" and impose "no responsibility or liability" on Live Oak to any party.  Spooner Decl., Ex. A at § 9.13.  Courts have consistently enforced virtually identical limitation-of-responsibility provisions in construction loan agreements to bar precisely the type of claims Union asserts here.

To illustrate, in *Kuhlmann v. Sabal Financial Group LP*, 26 F. Supp. 3d 1040 (W.D. Wash. 2014), the court enforced a construction loan agreement's "Limitation of Responsibility" provision containing language very similar to Section 9.13.  There, the loan agreement stated that inspections and approvals were "solely for the protection of [the lender's] interests" and that "[n]either Borrower nor . . . any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance."  *Id.* at 1045–46.  Despite this language, the plaintiffs in *Kuhlmann* argued that the lender was contractually required to condition each disbursement on satisfactory construction documentation and progress.  *Id.* at 1056–57.  The court rejected that theory and granted judgment on the pleadings, holding that the plaintiffs "attempt to do nothing more than rely upon [the lender's] determination of the appropriateness of the advances" and that the "express disclaimers" in the loan agreement meant the plaintiffs' reading of the contract "fail[ed] as a matter of law."  *Id.*

4923-9064-5921.9

North Carolina courts are in accord. As explained by the North Carolina Court of Appeals, "[a] lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party." *Camp v. Leonard*, 133 N.C. App. 554, 557 (1999); *c.f. Carlson v. Branch Banking & Trust Co.*, 123 N.C. App. 306, 315 (1996) (holding "any duty on the part of a commercial lender to a guarantor to monitor the use of loan proceeds by a borrower, must arise through contract."). For example, in *Lassiter v. Bank of North Carolina*, 146 N.C. App. 264 (2001), the borrowers under a construction loan argued that under the loan agreement, their lender had an affirmative duty to make property inspections before making loan disbursements "to insure that the loan [was] not drawn down below the point of construction completion." *Id.* at 267–68. But the North Carolina Court of Appeals rejected the borrower's argument and held that provisions under the loan agreement indicating the general purpose of the funds and the lender's right to inspect the property were "permissive and d[id] not create an affirmative duty on behalf of the lender." *Id.* at 269–70. The *Lassiter* court further held that alleged oral assurances by the loan officer that he would "look after" the borrowers were unenforceable both under the parol evidence rule and because the alleged assurances were not sufficiently definite to be enforced. *Id.* at 270.

Like the construction loan agreements in *Kuhlmann* and *Lassiter,* the Loan Agreement in this case does not include a promise by Live Oak to Union that it would ensure sufficient documentation was provided to prove construction progress before making a loan disbursement; rather, the Loan Agreement gives Live Oak the right to require documentation if it chose to do so to protect its own interests. *See* Spooner Decl., Ex. A at §§ 9.4–9.5. And just as the loan agreement in *Kuhlmann* included a disclaimer that defeated the plaintiffs' reading of the contract, here too the Loan Agreement includes an express disclaimer that Union had no "right to rely" on Live Oak's determination of the "appropriateness of any Disbursement." *Id.* at § 9.13. To the extent that Union attempts to base its claim on alleged oral or email communications from Live Oak employees, as explained by the *Lassiter* court, those allegations are barred by the parol evidence rule and in any event are not sufficiently definite enough to vary the terms of the parties' fully integrated, final agreement. *Id.* at § 8.1. Accordingly, Section 9.13 of the Loan Agreement is enforceable and disposes of all claims in this case.

- 9 -                                    LIVE OAK'S MOTION TO DISMISS

### 3.    The Full Text of the January 23, 2023 Email Disproves Union's Theory of the Case.

The full text of the January 23, 2023 email also defeats Union's claims, which are premised on the theory that Live Oak misrepresented or concealed the material facts related to Payment Application #1.  Union alleges that "By approving Payment Application #1, Live Oak expressly represented that it was supported by sufficient documentary evidence, such as invoices, and was a validly claimed expense under the Construction Contract."  FAC ¶ 16; *see also* FAC ¶ 30 ("Live Oak thereby expressly indicated that it had reviewed the application and verified that Regency had submitted adequate documentary support for Payment Application #1").

However, the actual email that Union selectively quotes tells an entirely different story.  Far from concealing anything, Lehmann's January 23, 2023 email discloses that "[w]e did want to make sure you all were aware of the mobilization line item being billed for $220,189.00.  This is higher then we typically see mobilization fees and wanted to get it on your radar for approval."  Spooner Decl., Ex. C. Further, Lehmann expressly informed Union that "[t]his is the one item we did not receive too much backup documents for and just wanted you all to be aware." *Id.* Despite these clear warnings, Union gave its approval two days later.  *Id.*  Having contractually disclaimed the right to rely on Live Oak's determinations, and having received and acted upon the very disclosures it now claims were withheld, Union cannot state a claim on any theory.

### B.    Union Fails to Plausibly Allege a Breach of Contract.

Under North Carolina law, a breach of contract claim requires "(1) existence of a valid contract and (2) breach of the terms of [the] contract." *McDonald v. Bank of New York Mellon Tr. Co., Nat'l Ass'n*, 259 N.C. App. 582, 586 (2018) (internal quotation omitted).  To state a breach of contract claim, the complaint must allege "(1) the existence of a contract between the parties, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the damages resulting to the plaintiff from the breach." *Thompson v. Bass*, 261 N.C. App. 285, 290–91 (2018) (dismissing claim where plaintiff failed to allege specific provisions breached and facts constituting breach).

The only allegation in the FAC that provides any insight into what contract provision Union claims was breached is FAC ¶ 13, which alleges that "[u]nder the Loan Agreement, Live Oak

agreed to, among other things, make disbursements directly to Regency for work that was completed by Regency on the Project and for which Plaintiffs would have been liable under the Construction Contract." But the Loan Agreement imposes no such requirement on *Live Oak*. Rather, it places the obligation on Union (and its contractor) to ensure the draw request is proper: "*Borrower* shall only submit a Draw Request with respect to work actually completed by the General Contractor in a good and workmanlike manner and for materials and equipment actually incorporated into the Premises in accordance with the Plans and Specifications." Spooner Decl., Ex. A, § 9.4 (emphasis added). Live Oak cannot breach a contractual provision that imposes a duty solely on Union.

Further, Union does not identify any contractual promise that, by approving a Payment Application, Live Oak was representing to Union that the application was supported by sufficient documentary evidence or was a validly claimed expense. To the contrary, Section 9.13 expressly provides that disbursements are not approvals or representations of any kind. Spooner Decl., Ex. A, § 9.13. Beyond FAC ¶ 13, the FAC recites only generalized conclusions—"failing to administer the Loan Agreement in good faith," "approving loan disbursements . . . not in accordance with . . . the Loan Agreement," and "administering the Loan Agreement for the benefit of Regency" (FAC ¶ 17)—without tethering these assertions to any identified paragraph, covenant, or disbursement prerequisite in the Loan Agreement.

In an apparent admission that no specific contractual requirement was violated, Union claims that "the documentary support for Payment Application #1 was insufficient to satisfy Live Oak's own internal disbursement policy at that time" (FAC ¶ 33), but even if true, an "internal disbursement policy" is not a contractual promise made to Union and cannot override the integrated, written Loan Agreement (Section 8.1) or its amendment requirement (Section 8.2). Absent citation to any specific provision of the Loan Agreement that Live Oak purportedly breached, the breach of contract claim should be dismissed.

**C.      The Implied Covenant of Good Faith and Fair Dealing Claim Is Duplicative and Fails.**

"[A]s a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as 'part and parcel' of the latter."  *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38 (2018); *see also Box Co. of Am., LLC v. Bostick*, No. 25CV003154-000, 2025 WL 3633645, at *6 (N.C. Super. Dec. 15, 2025) ("North Carolina state court decisions considering good faith and fair dealing claims that are 'part and parcel' of breach of contract claims ... have concluded that the two claims merely stand or fall together." (internal quotation omitted)).

To illustrate, in *Cordaro*, the North Carolina Court of Appeals dismissed a good faith and fair dealing claim against a construction lender based on the borrower's argument that the lender breached a contractual appraisal provision.  260 N.C. App. at 37–39.  But after the *Cordaro* court held that the breach of contract claim failed because the contractual appraisal provision was for the lender's sole benefit and granted the lender sole discretion, that holding was "likewise fatal to [the borrower's] claim for breach of the implied covenant of good faith and fair dealing" because the bases of the claims were "identical."  *Id.* at 38–39.

The same result follows here.  Union's implied covenant claim alleges that Live Oak exercised its "discretion over draw administration and disbursement in bad faith" (FAC ¶ 23), but Sections 9.4, 9.5, & 9.13 of the Loan Agreement dictate that the borrower and general contractor have a duty to jointly submit draw requests with sufficient documentation to satisfy the lender for the lender's own benefit, and the borrower may not rely on the lender's disbursement decisions.  Spooner Decl., Ex. A, §§ 9.4, 9.5, & 9.13.  Because the breach of contract claim fails on that ground, the implied covenant claim fails with it.  Stated differently, Union cannot use its good faith and fair dealing claim to re-write the parties' contract such that Live Oak is required to look after Union's interests in approving draw requests.  *C.f. James B. Taylor Fam.  Ltd. P'ship v. Bank of Granite*, 234 N.C. App. 478, 2014 WL 2777492, *8 (June 17, 2014) (rejecting good faith and fair dealing advanced by borrowers claiming a "right" that "would directly contradict" the terms of their note).  The Loan Agreement is clear that Union has the duty to submit and approve draw requests with

- 12 -                                 LIVE OAK'S MOTION TO DISMISS

4923-9064-5921.9

sufficient documentation to protect its own interests.  Union cannot advance a good faith and fair dealing claim that effectively asks the Court to delete the express disclaimer in Section 9.13 of the Loan Agreement.  *See, e.g., Maglione v. Aegis Fam.  Health Centers*, 168 N.C. App. 49, 56 (2005) (implied terms in a contract cannot "conflict with the express terms" of the agreement).

**D.**     **The Fraud Claim Fails to Satisfy Rule 9(b) and Fails on the Merits.**

Under North Carolina law, a fraud claim includes the following elements: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Mauro v. Mooney*, 210 N.C. App. 759, 2011 WL 1238427, \*3, n.3 (April 5, 2011) (internal quotation omitted).  Rule 9(b) further requires that a complaint in federal court raising a fraud claim specify "what is false or misleading about a statement, and why it is false," *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003), and provide "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir.  2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).  Union fails to plead all required elements of a fraud claim with heightened particularity.

**1.**     **The FAC Does Not Meet Rule 9(b)'s Particularity Requirements.**

The FAC's fraud allegations are vague and conclusory.  While the FAC names Lehmann as the speaker (FAC ¶ 26), it fails to specify when and how Lehmann allegedly "assured Plaintiffs that payment would only be issued for work actually completed or materials already ordered by Regency, with adequate supporting documentation."  FAC ¶ 28.  The FAC does not allege where this assurance was made, whether it was oral or written, or what specific words Lehmann used.  Nor does the FAC explain what was "false or misleading" about Lehmann's statements when the full January 23 email shows Lehmann did exactly what the FAC alleges he promised: he reviewed the available documentation, flagged the mobilization charge, disclosed the documentation gap, and sought Union's approval.  Spooner Decl., Ex. C.  These deficiencies are fatal under Rule 9(b).  *See Swartz*, 476 F.3d at 764.

- 13 -                    LIVE OAK'S MOTION TO DISMISS

## 2. The FAC Identifies No Actionable Misrepresentation.

The FAC vaguely alleges that Live Oak "indicated" that "Regency had submitted adequate documentary support for Payment Application #1, as required under the Loan Agreement and Live Oak's own disbursement standards." FAC ¶ 30. But the full text of the January 23 email—which the FAC quotes selectively—shows Lehmann did the opposite of what Union alleges: he warned that the mobilization charge was unusually high and that Live Oak had not received customary backup documentation for that item, then asked Union to approve the payment anyway. Spooner Decl., Ex. C. There is no false representation here—Live Oak disclosed the very facts Union claims were concealed, and Section 9.13 independently forecloses any attempt to treat a disbursement as an "approval" or "representation."

## 3. Union Cannot Plead Justifiable Reliance.

"[R]eliance is not reasonable if a plaintiff fails to make any independent investigation, or fails to demonstrate he was prevented from doing so." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449 (2015) (cleaned up). Rather, "to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* at 454 (cleaned up). For example, in *Cordaro*, a borrower alleged that the lender misrepresented the appraisal value of a property, but the court granted a motion to dismiss the misrepresentation claim where the borrower "fail[ed] to show that he either engaged in any type of independent inquiry as to the validity of the appraisal value or that he was in any way prevented from doing so." 260 N.C. App. at 36.

Here, Union never undertook an independent evaluation of Payment Application #1, nor was it prevented from doing so. The January 23 email provided information about the backup documentation, flagged the limited documentation for the mobilization item, and concluded by asking Union to approve the payment and stating "[p]lease let me know if you have any questions at all." Spooner Decl., Ex. C. Union does not—and could not credibly—allege that it was prevented from evaluating the backup documentation before approving the payment. Union was

- 14 -                    LIVE OAK'S MOTION TO DISMISS

invited to ask questions, chose not to, and approved the disbursement. That is the antithesis of justifiable reliance.

Moreover, there is no credible argument that Union could justifiably rely on Live Oak's approval of Payment Application #1 or any alleged statements made by Lehmann in light of Section 9.13 of the Loan Agreement which clearly states that Union had no "right to rely" on Live Oak's determination of the "appropriateness of any Disbursement." Spooner Decl., Ex. A at § 9.13; *c.f. Ace, Inc. v. Maynard*, 108 N.C. App. 241, 250 (1992) (fraud claim dismissed where contract specified that no representations were made). The parol evidence rule and the lack of specificity in the alleged representations also bar any claim founded upon supposed oral promises made by Lehmann. *See supra* Section III.A.2 (comparing this case to *Lassiter*).

**E.      The Negligent Misrepresentation Claim Is Barred by the Economic Loss Rule and Fails for Lack of a Duty of Care and Justifiable Reliance.**

The tort of negligent misrepresentation requires (1) justifiable reliance to the plaintiff's detriment, (2) on information prepared without reasonable care, (3) by one who owed the relying party a duty of care. *Suntrust Mortg., Inc. v. Busby*, 651 F. Supp. 2d 472, 481 (W.D.N.C. 2009). Union's negligent misrepresentation claim is barred by the economic loss rule, fails because Union cannot plausibly allege any statement by Live Oak that was false when made (given the January 23 email's warnings), and independently fails because Union has not shown that Live Oak owed it a duty of care or that Union justifiably relied.

**1.      The Economic Loss Rule Bars This Claim.**

Union's negligent misrepresentation "claim is barred by the North Carolina 'economic loss rule,' because a contractual relationship underlies [Union's] claims." *Cross v. Formativ Health Mgmt., Inc.*, 439 F. Supp. 3d 616, 627 (E.D.N.C. 2020) (dismissing negligent misrepresentation claim based on economic loss rule). The economic loss doctrine "generally limits recovery in tort when a contract exists between the parties that defines the standard of conduct and which the courts believe should set the measure of recovery." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 WL 56279, at *3 (N.C. Super. Ct. Jan. 5, 2016). "Since the parties defined the scope of [the defendant's] performance by contract, a failure to perform the contracted-for services is properly alleged as a

- 15 -                                      LIVE OAK'S MOTION TO DISMISS

4923-9064-5921.9

breach of their contract" not a tort. *Id.* at \*4. Here, the Loan Agreement defines the disbursement process and the scope of Live Oak's responsibilities (and non-responsibilities) with regard to approving draw requests. The alleged misrepresentations occurred during performance of the Loan Agreement, and essentially Union's argument is that Live Oak should have performed under the Loan Agreement in a different way than written. Accordingly, Union's negligent misrepresentation claim sounds in contract, not tort, and is barred by the economic loss rule.

### 2.   Union Cannot Establish Justifiable Reliance

Union's negligent misrepresentation claim also fails because Union has not and cannot plausibly allege justifiable reliance. "[J]ustifiable reliance is the lynchpin to stating a cause of action for negligent misrepresentation[.]" *Suntrust*, 651 F. Supp. 2d at 485.

In *Suntrust*, the court dismissed a negligent misrepresentation counterclaim where the borrowers admitted they knew the loan information was false before they signed the loan documents. *Id.* The court held that the borrowers "simply cannot, as a matter of law, be justified in relying on information prepared by another [that they] well knew to be false." *Id.* Similarly here, the FAC and the email relied upon show that Live Oak disclosed the mobilization line item, flagged it as higher than usual, and disclosed limited backup documentation. Union expressly knew about the line item and the documentation gap but chose to approve the payment anyway. Like the borrowers in *Suntrust*, Union cannot plausibly plead justifiable reliance in light of the facts provided in the FAC and incorporated documents. For the same reasons discussed above with respect to the fraud claim, see *supra* Section III.D.3, Union's reliance is further negated by Section 9.13's express disclaimer and Union's failure to make any independent inquiry. *See Ace*, 108 N.C. App. at 250.

### 3.   Union Has Failed to Show That Live Oak Owed It a Duty of Care.

Union's negligent misrepresentation claim independently fails because Union has not plausibly pled that Live Oak owed it a duty of care. Under North Carolina law, no fiduciary relationship or special duty of care arises from an ordinary commercial lending transaction. *See Dallaire v. Bank of Am., N.A.,* 367 N.C. 363, 368 (2014) ("Ordinary borrower-lender transactions, by contrast, are considered arm's length and do not typically give rise to fiduciary duties.").

Nothing in the Loan Agreement imposed on Live Oak a duty to protect Union's interests with respect to the review or approval of construction draw requests. *C.f. Perry v. Carolina Builders Corp.*, 128 N.C. App. 143, 150 (1997) (explaining that "in the absence of allegation of an express contractual provision between the instant parties requiring [the lender] to ensure application of the loan funds at issue to an agreed purpose, plaintiffs were owed no such legal duty."). To the contrary, Section 9.13 of the Loan Agreement expressly disclaims any such responsibility, providing that inspections and approvals are "solely for the protection of Lender's interests." Spooner Decl., Ex. A at § 9.13.

Based on North Carolina law and the text of the parties' agreement, Live Oak did not owe Union a duty of care. The Loan Agreement affirmatively disclaims any duty by providing that inspections and approvals are "solely for the protection of Lender's interests" and that Union has no "right to rely" on Live Oak's determination of the appropriateness of any disbursement. Spooner Decl., Ex. A at § 9.13. The Loan Agreement thus forecloses any argument that Live Oak owed Union a duty of care with respect to reviewing Payment Application #1 or approving the disbursement. Because Union cannot establish that Live Oak owed it a duty of care—an essential element of a negligent misrepresentation claim—this claim fails as a matter of law.

**F.      The UDTPA Claim Fails on Multiple Independent Grounds.**

To state a UDTPA claim, a plaintiff must allege "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000). Whether a practice is unfair or deceptive is a question of law for the court. *Defeat The Beat, Inc. v. Underwriters At Lloyd's London*, 194 N.C. App. 108, 118 (2008). A mere breach of contract—even if intentional—is insufficient to support a UDTPA claim; rather, "substantial aggravating circumstances must attend the breach." *Mitchell v. Linville*, 148 N.C. App. 71, 75 (2001) (internal quotation omitted).

The FAC includes three categories of allegations as the bases for its UDTPA claim: (1) Live Oak allegedly "misleading [Union] about the sufficiency of documentary support for Payment Application #1," (2) Live Oak allegedly "withholding material facts concerning the draw process," and (3) Live Oak's alleged failure to produce the documents supporting Payment Application #1

- 17 -                     LIVE OAK'S MOTION TO DISMISS

upon request in July 2024 and then Live Oak's alleged presentation of "a backdated loan modification embedded with sweeping release language" in November 2025.  FAC ¶¶ 46–57.  Each theory fails on the merits, including because Union cannot plead reasonable reliance or proximate causation in the face of the incorporated email and the Loan Agreement's express no-reliance language, and each theory is also barred by the economic loss rule.

### 1.      The Economic Loss Rule Independently Bars the UDTPA Claim.

As an initial matter, under any factual theory, Union's UDTPA claim is barred by the economic loss rule because it is fundamentally a contract dispute.  Issues regarding what performance is due under a contract belong in "the arena of contract law" and should not be adjudicated under the guise of a UDTPA claim.  *Cross*, 439 F. Supp. 3d at 624 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998)).

The *Cross* case is illustrative.  There, patients alleged that a health records provider engaged in unfair and deceptive practices by charging fees that exceeded statutory limits for medical records requests.  *Id.* at 621–22.  The *Cross* court dismissed the UDTPA claim, holding that where "the rights and remedies of the parties" were defined by the contractual terms governing the records transactions, the dispute belonged in "the arena of contract law" rather than under the UDTPA.  *Id.* at 624.  In other words, because the patients' theory of deception was inseparable from the question of what the underlying contracts required, allowing the claim to proceed under the UDTPA would improperly circumvent contract principles.  *Id.*

Here, Union's UDTPA claim rests on the same type of contract-bound allegations.  Union contends that Live Oak misled it about the sufficiency of documentation for Payment Application #1 and failed to administer the draw process properly—but these are disputes about how Live Oak performed its obligations under the Loan Agreement, not independent deceptive acts in commerce.  The Loan Agreement defines the disbursement process, allocates responsibility for documentation review, and expressly limits Live Oak's liability through Section 9.13.  Whether Live Oak satisfied those contractual standards is a contract question, not a UDTPA question.  As in *Cross*, Union's attempt to recast a contract performance dispute as an unfair trade practice should be rejected and barred by North Carolina's economic loss rule.

- 18 -                    LIVE OAK'S MOTION TO DISMISS

**2.      Union's Misrepresentation Theory Fails for Lack of Reasonable Reliance.**

Where, as here, a UDTPA claim "stem[s] from an alleged misrepresentation" the plaintiff must "demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88 (2013).  This requires a showing of actual reliance *and* reasonable reliance.  *Id.* at 89.

Union's UDTPA theory that Live Oak somehow misled it about the sufficiency of documentary support for Payment Application #1 fails on this record.  Section 9.13 of the Loan Agreement expressly provides that Union had no "right to rely" on Live Oak's disbursement determinations, rendering any reliance legally unreasonable.  *See Rosen v. Club at Longview, LLC*, 263 N.C. App. 410, 2018 WL 6614054, *6 (December 18, 2018) (dismissing UTPA claim where governing document disclaimed the representation at issue, rendering reliance on contrary oral statement legally unreasonable).  Moreover, the full text of the January 23 email contradicts Union's misrepresentation theory.  Because the documents Union itself relied on in the FAC demonstrate that Live Oak's communications were candid, not deceptive, the misrepresentation theory fails to support a UDTPA claim.

**3.      Union's Failure-to-Disclose Theory Fails for Lack of a Duty to Disclose.**

To the extent Union's UDTPA claim rests on allegations that Live Oak withheld material facts about the draw process—including its refusal to produce documentation related to Payment Application #1 in July 2024 and February 2025 (FAC ¶¶ 45–52)—this theory fails because Union has not established that Live Oak had a legal duty to disclose the information allegedly withheld. Under North Carolina law, a nondisclosure may constitute an unfair or deceptive practice only where the defendant had a legal duty to communicate the withheld information.  *Kron Medical Corp. v. Collier Cobb & Assocs., Inc.,* 107 N.C. App. 331, 340–41 (1992).  Such a duty typically arises from "a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances."  *Id.* at 340 (quoting *Setzer v. Insurance Co.*, 257 N.C. 396, 399 (1962)).

In *Kron*, the court upheld a UDTPA claim based on nondisclosure only because the defendants were insurance brokers who occupied a fiduciary relationship with the insured, had a "duty to speak," and possessed knowledge of the plaintiff's misunderstanding about the scope of

4923-9064-5921.9

coverage. 107 N.C. App. at 341. The court emphasized that the defendants' fiduciary duty obligated them to keep the insured informed about coverage terms, and that their silence in the face of a known misunderstanding was "a statement as deceptive as a false or inaccurate written or oral comment." *Id.* The *Kron* holding thus turned on three features that are entirely absent here: a fiduciary relationship, a duty to speak arising from that relationship, and knowledge of the plaintiff's misunderstanding.

Unlike the insurance brokers in *Kron*, Live Oak occupied no fiduciary relationship with Union. The North Carolina Supreme Court has made clear that "[o]rdinary borrower-lender transactions . . . are considered arm's length and do not typically give rise to fiduciary duties," and "the law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368 (2014). Similarly, in *Cordaro*, discussed *supra,* the court held that a construction lender owed no fiduciary duty to its borrower and that the lender's appraisal was prepared for the lender's sole benefit per the contractual language. 260 N.C. App. at 38–39. This is precisely the relationship between Live Oak and Union—an arm's-length lending transaction governed by a written agreement that expressly disclaims lender responsibility for disbursement determinations. Spooner Decl., Ex. A, § 9.13. Moreover, Union personally reviewed and approved the disbursement after Lehmann flagged the mobilization charge and the documentation gap. Spooner Decl., Ex. C. Thus, Union cannot claim that information about a draw it reviewed and expressly approved was improperly withheld.

### 4. The Remaining Allegations Fail for Lack of Proximate Causation.

The FAC's allegations about post-hoc document-production disputes (FAC ¶¶ 45–52) and an unsigned loan modification (FAC ¶¶ 53–56) do not state a UDTPA claim because Union has not articulated how this conduct proximately caused actual injury. Even under Union's telling, the loan modification went unsigned—Union rejected it. FAC ¶ 56. "Recovery will not be had [for a UDTPA claim] where the complaint fails to demonstrate that the act of deception proximately resulted in some adverse impact or actual injury to the plaintiff." *Walker v. Sloan*, 137 N.C. App. 387, 399 (2000). In *Walker*, the court dismissed a UDTPA claim where the transaction was never consummated and the plaintiffs could not show that the alleged deception proximately caused their

- 20 -                    LIVE OAK'S MOTION TO DISMISS

damages. *Id.* at 399–400.  Similarly, here, any damages flow from Regency's performance under the Construction Contract, not from Live Oak's subsequent document decisions or an unsigned modification, so those allegations cannot form the basis of a UDTPA claim.

## VI.    CONCLUSION

For the foregoing reasons, Live Oak respectfully requests that the Court dismiss Union's FAC in its entirety with prejudice.  Dismissal with prejudice is appropriate because amendment would be futile.  The Loan Agreement's Section 9.13 forecloses, as a matter of contract, any theory premised on lender responsibility for disbursement determinations, and Sections 8.1 and 8.2 prevent Union from re-casting alleged communications as new contractual duties.  The full text of the January 23 email further establishes that Live Oak disclosed the mobilization charge, flagged its unusual size, noted the documentation gap, invited questions, and obtained Union's express approval.  Moreover, North Carolina law is clear that a construction lender owes no duty of care to its borrower to monitor or evaluate the sufficiency of draw request documentation absent an express contractual provision creating such a duty—and no such provision exists here, particularly given the Loan Agreement's "NO FIDUCIARY RELATIONSHIP" clause (Section 8.13).  No amount of repleading can change the terms of the contract or the contents of the January 23 email.  Union has already had one opportunity to amend (before this case was removed), and the amendments it made—adding a second plaintiff, a new implied covenant claim, and additional narrative detail— did not and could not cure the fundamental problems.  Accordingly, dismissal with prejudice is warranted here. *Cross*, 439 F. Supp. 3d at 631 (ordering dismissal with prejudice because "the viability of plaintiffs' claims turns largely upon issues of the scope of North Carolina law, and it is unlikely that any amendment to the factual allegations will cure the deficiencies in plaintiffs' claims").

LIVE OAK'S MOTION TO DISMISS

4923-9064-5921.9

Dated: May 8, 2026                                  MILLER NASH LLP

                                                    By: */s/ Bernie Kornberg*
                                                    Bernie Kornberg
                                                    KC Hovda (*Pro Hac Vice Forthcoming*)

                                                    *Attorneys for Defendant*
                                                    *Live Oak Banking Company*

4923-9064-5921.9