Docusign Envelope ID: 74C02B62-C8E6-8616-8205-FBA4AAB5B32D

MILLER NASH LLP
Bernie Kornberg, Bar No. 252006
bernie.kornberg@millernash.com
KC Hovda (*Pro Hac Vice Forthcoming*)
kc.hovda@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone:    562.435.8002
Facsimile:    562.435.7967

Attorneys for Defendant
Live Oak Banking Company

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 31014 UNION CITY BLVD LLC, a California limited liability company; and UNION CITY VETERINARY CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE OAK BANKING COMPANY, a North Carolina Corporation, and Does 1 through 100,<br><br>Defendants. | Case No. 4:26-cv-03958-KAW<br><br>**DECLARATION OF KEILAH SPOONER IN SUPPORT OF LIVE OAK BANKING COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** |

I, Keilah Spooner, hereby declare and state:

1.    I am employed by Live Oak Banking Company ("Live Oak") as a Special Assets Officer in Wilmington, North Carolina.  I make this declaration in support of Live Oak's Motion to Dismiss the First Amended Complaint filed by Plaintiffs 31014 Union City Blvd LLC and Union City Veterinary Corporation (collectively, "Union").

2.    My duties at Live Oak include serving as custodian of records on behalf of Live Oak as to the loan at issue in this case. I am familiar with the manner and procedures by which the records, letters, and memoranda contained in Live Oak's files are prepared and maintained. Those records, letters, and memoranda are prepared by agents or employees of Live Oak in performance of their regular business duties. Those records, letters, and memoranda are made either by persons with knowledge of the matters they record or from information supplied by

- 1 -

persons with such knowledge. It is Live Oak's regular business practice to maintain such records, letters, or memoranda in the course of its business. The documents herein contained and referenced are business records produced and maintained in this above-described manner. Except as otherwise specifically stated in this Declaration, the facts set forth herein are based on my review of the files related to this account and if called as a witness I could and would be competent to testify to those facts.

3.    Attached hereto as **Exhibit A** is a true and accurate copy of the Loan Agreement between Live Oak and Union, executed on or about November 6, 2021.

4.    Attached hereto as **Exhibit B** is a true and accurate copy of the SBA Loan Authorization for the Union loan at issue in this case, including related Memoranda to File reflecting modifications to the Authorization.

5.    Attached hereto as **Exhibit C** is a true and accurate copy of a January 23–25, 2023 email chain between Live Oak's construction closing specialist, Charlie Lehmann, and Union's representatives regarding the loan draw at issue in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Wilmington, North Carolina.

Dated: May 5, 2026

Signed by:

Keilah Spooner
Keilah Spooner
Special Assets Officer

- 2 -

SPOONER DECLARATION IN SUPPORT
OF LIVE OAK'S MOTION TO DISMISS

# EXHIBIT A

## LOAN AGREEMENT

This Loan Agreement (this "Agreement"), made and entered into on ___November  05___, 2021, by and between 31014 UNION CITY BLVD LLC, a California limited liability company and UNION CITY VETERINARY CORPORATION, a California corporation (collectively, whether one or more, the "Borrower"), MARK ALAN DOTY II, DEBRA CHEN, and GURDIP SINGH (collectively, whether one or more, the "Guarantor") and LIVE OAK BANKING COMPANY ("Lender").

### RECITALS:

Borrower has requested that Lender provide financing to Borrower, and Lender is willing to make a loan to Borrower subject to the terms and conditions set forth in this Agreement;

NOW, THEREFORE, for good and valuable consideration contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, agree to be bound as follows:

### ARTICLE I
### LOAN AND NOTE

1.1     LOAN. The U.S. Small Business Administration ("SBA") has entered into that certain SBA Loan Authorization ("SBA Loan Authorization") with Lender, being known as SBA Loan Number 16066491-09. As set forth in the SBA Loan Authorization, Lender is willing to make a loan in the original principal amount of THREE MILLION SEVEN HUNDRED NINETY THOUSAND AND NO/100 DOLLARS ($3,790,000.00) (the "Loan") to Borrower subject to the terms and conditions contained in this Agreement.   Upon substantial completion of the Project or 12 month(s) after the initial disbursement date of the Loan, Lender reserves the right, in its sole and absolute discretion, to either: (i) disburse the remaining proceeds of the Loan to Borrower as allocated or in such allocation determined in the sole and absolute discretion of Lender; or (ii) cease future disbursements of the Loan and cap the Note at the amount of proceeds of the Loan then disbursed.  Borrower agrees to execute and deliver such documentation required by Lender to effectuate the terms hereof. Borrower agrees to comply with all terms, conditions and provisions of the SBA Loan Authorization.  This Agreement shall automatically be amended to include each and every term and condition of the SBA Loan Authorization, as may be amended from time to time.

1.2     NOTE. Borrower has executed and delivered to Lender that certain SBA Note (the "Note"), dated of even date herein, which evidences the indebtedness of Borrower to Lender in the original principal amount of THREE MILLION SEVEN HUNDRED NINETY THOUSAND AND NO/100 DOLLARS ($3,790,000.00). Payment of the Note shall be made at Lender's office at 1741 TIBURON DRIVE, WILMINGTON, NORTH CAROLINA 28403 unless otherwise directed in writing by Lender. The Note shall bear interest at the initial rate of four and fifteen one hundredths percent (4.15%) per annum, in accordance with the terms of the Note. The term "Note" as used in this Agreement shall be inclusive of any and all future renewals, extensions, increases, substitutions and other modifications of the Note.

## *ARTICLE II*
## CONDITIONS OF LENDING

2.1    CONDITIONS PRECEDENT. The obligation of Lender to make the Loan to Borrower and to make future disbursements of the Loan subsequent to the date of this Agreement is expressly subject to the performance by Borrower and Guarantor of all of their obligations under this Agreement and to the following further conditions:

(a)    Borrower and Guarantor shall execute and deliver to Lender this Agreement, the Note, and any and all documents, affidavits, certifications or other agreements evidencing or otherwise related to the Loan (collectively, the "Loan Documents") which may be required in the sole and absolute discretion of Lender;

(b)    All representations and warranties of Borrower and Guarantor as set forth in this Agreement, the Note and the Loan Documents are true and correct;

(c)    No condition or event exists or has occurred which would constitute an Event of Default under this Agreement, the Note or the Loan Documents;

(d)    No material adverse change has occurred in the financial condition of Borrower or Guarantor since the date of the most recent submission of Financial Information to Lender; and

(e)    Borrower has paid all fees and other charges due in connection with the Loan.

2.2    USE OF PROCEEDS. Borrower shall only use the proceeds of the Loan as set forth in Paragraph G of the SBA Authorization dated September 9, 2021 (the "Project").

2.3    INJECTION. The obligation of Lender to make the Loan to Borrower is expressly subject to the satisfaction of Borrower's injection obligations (the "Injection") towards the Project as follows:

$450,000.00    Borrower Cash Injection

The Injection must be completed simultaneously with or prior to the first disbursement of proceeds from the Loan. If applicable, Lender may hold any undisbursed Injection in a controlled account which (i) shall be under Lender's sole and exclusive control; (ii) may not be withdrawn by Borrower; and (iii) shall be managed and disbursed in the sole and absolute discretion of Lender.

## *ARTICLE III*
## REPRESENTATIONS AND WARRANTIES OF BORROWER AND GUARANTOR

Borrower and Guarantor, understanding that Lender is relying upon Borrower's and Guarantor's representations and warranties set forth below in making the Loan, represent and warrant to Lender as follows:

3.1    POWER AND AUTHORIZATION. Borrower and Guarantor have duly authorized the execution and delivery of this Agreement, the Note, and the Loan Documents, and the execution and delivery to Lender thereof will not violate any applicable law or agreement to which Borrower or Guarantor is a party to or may be bound or affected by.

3.2    BINDING AGREEMENTS. This Agreement, the Note and the Loan Documents constitute legal, valid and binding obligations of Borrower and Guarantor which are enforceable against the Borrower and Guarantor by Lender.

3.3    VALID ORGANIZATION AND GOOD STANDING.  For any Borrower or Guarantor which is an entity, they are duly organized, validly existing and in good standing under the laws of the State(s) in which they were formed and authorized to conduct business, have the full power and authority to carry on its business operations and are duly licensed or qualified under the laws of each jurisdiction in which they operate.  Borrower and Guarantor further represent and warrant that their employees and agents have all required licenses, registrations, approvals and other authority as may be necessary to operate and perform its business operations.

3.4    OWNERSHIP INTERESTS.  All ownership interests of Borrower, including, but not limited to, membership interests, stock, options, warrants and any and all other agreements affecting the ownership, control or voting rights of such ownership interests of Borrower are properly and accurately reflected in this Agreement, the Note and the Loan Documents.

3.5    NAMES AND ADDRESSES.  Except as disclosed in the Financial Information or otherwise disclosed and consented to by Lender in writing, Borrower and Guarantor have not been known by any other names (including tradenames) nor have Borrower or Guarantor been located at or operated from any addresses other than those set forth in this Agreement, the Note and the Loan Documents.

3.6    FINANCIAL CONDITION.  The reports, disclosures, statements and other financial information (collectively, the "Financial Information") submitted by Borrower and Guarantor in writing to Lender in connection with the Loan fairly and accurately reflect the financial condition of Borrower and Guarantor for the periods defined therein.  No material adverse changes have occurred in Borrower or Guarantor since the submission of the most recent Financial Information to Lender.  Except as disclosed in the Financial Information or otherwise disclosed and consented to by Lender in writing, Borrower and Guarantor (i) have not incurred any debts, liabilities or other obligations, nor committed to incur any debts, liabilities or obligations, except in the ordinary course of business or in the course of individual and personal affairs; (ii) have no liabilities, direct or contingent; (iii) have made no investments in, advances to, or guaranties or obligations of any other company, person, firm, corporation, or other entity; (iv) is not subject to any judgment, nor are there any liens, encumbrances or security interests outstanding against Borrower, Guarantor or the Collateral; (v) have not been materially or adversely affected in any way by any casualty, strike, lockout, pending or threatened labor dispute or similar occurrences or grievances.

3.7    TAXES.  All of Borrower's and Guarantor's taxes, assessments, and other governmental charges have been paid in full, except those which are not yet due and payable.  All tax returns and reports that are or were required to be filed, have been filed and are accurate in all respects.

3.8    LITIGATION.  Except as disclosed in the Financial Information or otherwise disclosed and consented to by Lender in writing, there is no litigation, investigation, proceeding, claim, dispute or other similar action pending or threatened against Borrower or Guarantor.

3.9    COLLATERAL.  Except as disclosed in the Financial Information or otherwise disclosed and consented to by Lender in writing, Borrower and Guarantor, as the case may be, own free and clear title to the Collateral securing the Loan, with the exception of liens for taxes not presently due and payable and the liens or security interests in favor of Lender.  Borrower and Guarantor have not

entered into, granted or permitted the filing or attachment of any liens or security interests against the Collateral that would be prior to, or that may in any way be superior to, Lender's rights in and to the Collateral. Borrower and Guarantor further represent and warrant that title to all Collateral securing the Loan are held in Borrower's and/or Guarantor's exact legal name and are properly reflected in the Loan Documents.

3.10  HAZARDOUS SUBSTANCES.  Except as disclosed in the Financial Information or otherwise disclosed and consented to by Lender in writing, (i) there has been no use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any Hazardous Substance by, on, under, about or from any of the Collateral securing the Loan in violation of applicable Environmental Laws; and (ii) there is no threatened or pending claim, action, investigation, or proceeding seeking to enforce any right or remedy against Borrower, Guarantor or any Collateral securing the Loan under any Environmental Laws. Borrower and Guarantor have not filed any notice under any federal or state law indicating past or present treatment, storage or disposal of Hazardous Substances and none of the operations of Borrower or Guarantor are the subject of federal or state litigation or proceedings, or of any investigation evaluating whether any remedial action involving a material expenditure is needed to respond to any improper treatment, storage, recycling, disposal or release into the environment of any Hazardous Substance. Borrower and Guarantor do not transport any Hazardous Substances except as previously disclosed in Financial Information. All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the operation of Borrower's business and the use of any leasehold property or real property pledged as Collateral for the Loan, including, without limitation, past or present treatment, storage, disposal or release of a Hazardous Substance or solid waste into the environment, have been duly obtained or filed. The representations and warranties contained herein are based on Borrower's and Guarantor's due diligence in investigating its business operations and the Collateral for Hazardous Substances based upon Environmental Laws.

3.11  ACCURACY OF REPRESENTATIONS AND WARRANTIES.  Any and all representations and warranties by Borrower and Guarantor contained in this Agreement, the Note and the Loan Documents are true and correct. There is no material fact or circumstance that Borrower and Guarantor have knowledge of which has not been disclosed to Lender.

## ARTICLE IV
## COVENANTS OF BORROWER AND GUARANTOR

Until all the obligations under the Loan as evidenced by this Agreement, the Note and the Loan Documents have been performed and paid in full, Borrower and Guarantor covenant and agree as follows:

4.1  INSURANCE.  Borrower and Guarantor shall maintain insurance in such amounts, in such types and against such hazards and liabilities as may be reasonably required by Lender. All such policies of insurance shall be in form and substance and with insurance companies satisfactory to Lender, and Borrower and Guarantor shall deliver evidence of same as Lender may request. Lender shall be designated as lender's loss payee, mortgagee, or such other designation as Lender may elect under any such policies, as its interests may appear. Borrower shall also maintain Builder's Risk Insurance during the Construction upon the Premises.

4.2 MAINTENANCE AND EXISTENCE. For any Borrower or Guarantor which is an entity, they shall remain in good standing under the laws of the State(s) in which they were formed and conduct business. Further, Borrower and Guarantor shall comply with all valid and applicable statutes, ordinances, rules and regulations and shall keep in force and effect all licenses, permits, bonds and other agreements or approvals necessary to conduct business. Borrower and Guarantor shall not (i) engage in any business activities substantially different than those in which they are presently engaged; (ii) merge with, acquire, or consolidate with any other business entity; (iii) convert to a different kind of business entity; (iv) change their legal name; or (v) cease operations, liquidate or dissolve.

4.3 DIVIDENDS AND DISTRIBUTIONS. Borrower shall not declare or pay any dividends or make any distributions except from Borrower's current year net profits provided that (i) such dividend or distribution does not violate any covenant, term or condition of this Agreement, the Note or the Loan Documents; and (ii) no Event of Default exists. All loans from and/or distributions to Borrower's principals shall be subordinate to the Loan.

4.4 TAXES. Borrower and Guarantor shall pay promptly, when due, all taxes, assessments and governmental charges or levies imposed upon Borrower or Guarantor or upon the Collateral.

4.5 ADVERSE CHANGES AND LITIGATION. Borrower and Guarantor shall immediately inform Lender of (i) any material adverse change in its financial condition and (ii) any litigation or threatened litigation or of the occurrence of any other event or circumstance which might substantially affect the financial condition of Borrower or Guarantor.

4.6 MANAGEMENT AND OWNERSHIP. No change in the management, control or ownership of Borrower shall be made without the prior written consent of Lender. SBA must approve any proposed adjustment to, or change in, ownership structure or interests in the Borrower, including percentage of ownership, within the first twelve (12) months after final disbursement of the Loan.

4.7 REPORTING REQUIREMENTS. Within 60 (sixty) days after the end of each fiscal quarter, Borrower shall furnish or cause to be furnished to Lender a copy of the Borrower's current internal, unaudited quarterly financial statement, and those of each Guarantor, (provided, however that with respect to the Guarantor, only annual financial statements need to be provided). Within sixty (60) days after the expiration of each calendar year, Borrower and Guarantor shall furnish to Lender annual financial statement of Borrower. Borrower's financial statement shall contain a balance sheet, profit and loss statement and aging of accounts receivable and account payable, all in reasonable detail, prepared in accordance with generally accepted accounting principles, consistently applied. Each set of financial statements shall be certified by a duly authorized officer of Borrower and Guarantor to be correct and accurate. Borrower and Guarantors shall also furnish copies of their complete income tax returns within thirty (30) days of filing, commencing with the tax return filed or to be filed for the current calendar year. Other information, such as proof of real property tax payments, accounts payable agings, more frequent interim financial statements and additional financial information may be required at the Lenders request.

4.8    OTHER DEBTS.  Except for the loan from LIVE OAK BANKING COMPANY in the original principal amount of TWO HUNDRED TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($225,000.00), Borrower shall not directly or indirectly incur, create, assume or permit to exist any obligation for payment of borrowed money, excepting only unsecured current liabilities incurred and taxes payable in the ordinary course of business, obligations contemplated by this Agreement and consumer debt incurred by an individual Borrower or Guarantor for personal, family, or household purposes, without the express written consent of Lender.  Further, Borrower shall not directly or indirectly guarantee the obligations of any person or entity without the prior written consent of Lender.

4.9    SALE OF COLLATERAL.  Borrower and Guarantor shall not sell, lease, transfer or otherwise dispose of any of the Collateral as described in this Agreement other than in the ordinary course of business without the prior written consent of Lender.  If Borrower or Guarantor should desire to sell any of the Collateral outside the course of ordinary business, Lender shall designate a release price or terms of a collateral substitution, along with any other terms and conditions determined in the sole and absolute discretion of Lender.

4.10    LIENS AND ENCUMBRANCES.  Borrower and Guarantor shall not incur or permit any encumbrance, pledge or lien upon or against any of the Collateral, except:
    (a)    Liens or security interests required by this Agreement.
    (b)    Liens or security interest which have approved in writing by Lender and expressly permitted within the Loan Documents.
    (c)    Liens for taxes, assessments and other governmental charges not yet due and payable.
    (d)    Liens or security interests to secure obligations incurred by an individual Borrower or Guarantor for personal, family, or household purposes.

4.11    EXAMINATION OF RECORDS AND COLLATERAL.  Upon three (3) days written notice, Borrower and Guarantor shall permit any representative of Lender to visit, examine, inspect, test and audit any or all of Borrower's books and records and the Collateral as Lender deems reasonably appropriate to ensure Borrower's and Guarantor's compliance with this Agreement, the Note and the Loan Documents, at Borrower's sole cost and expense.  If Borrower now or hereafter maintain any records (including, without limitation, computer-generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower shall, at Lender's request, notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records Lender may request, at Borrower's sole cost and expense. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements and supporting documentation of Borrower and Guarantor relating in any way to the Project and the Collateral.

4.12    ENVIRONMENTAL MATTERS.  Borrower and Guarantor shall comply with all Environmental Laws and ensure that any and all Collateral securing the Loan is free of Hazardous Substances.  As used in this Agreement, "Hazardous Substances" shall mean (i) any "Hazardous Waste," as defined by the Resource Conservation and Recovery Act of 1976, as amended; (ii) any "Hazardous Substance" as defined under applicable State law; (iii) any "Hazardous Substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1989, as amended; (iv) any material or substance, the presence of which is prohibited by any federal, state or

local law, statute, ordinance or regulation, or court administrative order or decree, or requires special handling in collection, storage, treatment or disposal; and (v) any materials that, because of their quantity, concentration, or physical, chemical, or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported, or otherwise handled. The term "Environmental Laws" shall mean (i) any and all state, federal, and local statutes, regulations, and ordinances relating to the protection of human health or the environment; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), as amended; (iii) the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), as amended; (iv) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., as amended; (v) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended; and (vi) other applicable state or federal laws, rules, or regulations adopted pursuant thereto. Borrower and Guarantor will take and continue to take prompt action to remedy all environmental pollution and contamination, Hazardous Waste disposal and other environmental clean-up problems, if any, whether or not such issues have resulted from the order or request of a municipal, state, federal, administrative or judicial authority, or otherwise. Borrower and Guarantor will not violate any applicable municipal ordinance, state or federal statute, administrative rule or regulation, or order or judgment of any court with respect to environmental pollution or contamination, hazardous waste disposal or any other environmental matter. Borrower and Guarantor shall, at their sole cost and expense, conduct and complete all investigations, sampling, and testing required by Lender and all remedial, removal, and other actions necessary to clean up and remove all such Hazardous Substances on, under, about, or affecting any of the Collateral in accordance with all applicable Environmental Laws. Borrower and Guarantor shall give Lender prompt written and oral notice if Borrower or Guarantor receives any notice with regard to Hazardous Substances on, under, about, or affecting any of the Collateral. Borrower and Guarantor will indemnify and hold Lender, its officers, directors, employees, representatives, agents, and affiliates harmless against, and promptly pay on demand or reimburse each of them with respect to, any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses of any and every kind or nature whatsoever asserted against or incurred by any of them by reason of or arising out of or in any way related to the breach of any representation or warranty as set forth herein regarding Environmental Laws or the failure of Borrower to perform any obligation herein required to be performed pursuant to Environmental Laws. The provisions of this Section 4.12 shall survive the final payment of the Loan and the termination of this Agreement and shall continue thereafter in full force and effect. Notwithstanding anything contained in this Agreement to the contrary, any covenants of Borrower concerning Hazardous Substances and Environmental Laws addressed herein shall not be applicable to any condition which is first created or introduced after a foreclosure, conveyance or other transfer of title of the real property pledged as Collateral for the Loan. Medical service providers occupying the Collateral may use, store, and dispose of Hazardous Substances only if such use, storage, and disposal is (i) undertaken in the ordinary course of their respective medical practices, and (ii) performed in strict conformity with applicable Environmental Laws.

4.13    LOANS AND INVESTMENTS. Borrower shall not (i) lend money, invest in, or advance money or assets to any other person, enterprise, or entity; (ii) purchase, create, or acquire any interest in any other enterprise or entity; (iii) incur any obligation as surety or guarantor other than in the ordinary course of business; or (iv) enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in

connection herewith. Further, Borrower and Guarantor agree and acknowledge that any and all loans to Borrower from any principal, member, shareholder or other affiliate of Borrower shall be expressly subordinate in all respects to this Loan.

4.14 LEASING. Borrower and Guarantor shall not permit any lease or leasehold interest in the Collateral to have priority over the rights of Lender. Prior to the closing of the Loan and at any time thereafter, Lender shall have the right to require Borrower to promptly delivery to Lender (i) tenant subordination agreements; (ii) subordination, nondisturbance, and attornment agreements ("SNDA"); (iii) estoppel letters; and (iv) any other such document requested in the sole and absolute discretion of Lender in form and substance satisfactory to Lender. Further, Borrower and Guarantor also acknowledge and agree that, during the term of the Loan, Borrower and Guarantor will not lease any space in any building purchased or renovated by Loan proceeds to any business engaged in any activity that is illegal under federal, state or local law (such as a marijuana dispensary), including businesses that make, sell, service or distribute products or services used in connection with illegal activity.

4.15 PATRIOT ACT. Borrower and Guarantor certify that they are, and will remain, in compliance with the United States of America Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") and shall continue to provide evidence satisfactory to and sufficient for the Lender to verify the identity of the Borrower, as required under the Patriot Act. Borrower shall notify Lender promptly of any change in such information.

4.16 STRICT COMPLIANCE. Borrower and Guarantor shall (i) perform and comply, in a timely manner, with all terms, conditions, and provisions of this Agreement, the Note and the Loan Documents; and (ii) immediately notify Lender in writing of an Event of Default in connection with this Agreement, the Note and the Loan Documents. Upon written request from Lender, Borrower and Guarantor shall deliver a compliance certificate to Lender which certifies that the representations and warranties set forth in this Agreement, the Note and the Loan Documents are true and correct and that no Event of Default exists thereunder. Borrower and Guarantor, at their sole cost and expense, further agree to execute and delivery to Lender any documents, assignments, instruments, and other agreements as Lender may reasonably request to evidence the Loan, secure and perfect the Collateral, or correct any deficiencies or errors in this Agreement, the Note and the Loan Documents.

## ARTICLE V
## EVENTS OF DEFAULT

5.1 EVENT OF DEFAULT. An event of default (an "Event of Default") shall be deemed to have occurred hereunder upon any of the following:

(a) Nonpayment, when due, of any principal, accrued interest, premium, fee or other charge due under the Note;

(b) Any representation, warranty, or statement made or furnished to Lender by or on behalf of Borrower and Guarantor under this Agreement, the Note and the Loan Documents is false or misleading in any material respect, or becomes false or misleading in any material respect at any time thereafter;

(c) The failure or violation of Borrower and Guarantor to keep, perform, observe, or comply with

any covenant, agreement, term, or condition required under provisions of this Agreement, the Note or the Loan Documents;

(d) The occurrence of any event or condition which constitutes a default under the terms of the Note or the Loan Documents;

(e) A default by Borrower under any loan, extension of credit, or other obligation to Lender;

(f) If this Agreement, the Note or the Loan Documents cease to be in full force and effect, including, but not limited to, the failure of any lien instruments securing the Collateral to create a valid and perfected security interest in accordance with the terms of this Agreement, the Note and the Loan Documents;

(g) Borrower suffers or permits any lien, encumbrance or security interest to attach to the Collateral, unless permitted by this Agreement or the Loan Documents or otherwise consented to in writing by Lender, or if any judgment is entered against Borrower and attaches to the Collateral;

(h) If Borrower or Guarantor revokes or disputes the validity or enforceability of their obligations under this Agreement, the Note or the Loan Documents;

(i) If Borrower or Guarantor (i) makes a general assignment for the benefit of its creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudicated as bankrupt or insolvent; (iv) files any petition or answer seeking, consenting to, or acquiescing in, reorganization, arrangement, composition, liquidation, dissolution or similar relief, under any present or future statute, law or regulation; (v) files an answer admitting or failing to deny the material allegations of the petition against it for any such relief; (vi) admits in writing its inability to pay its debts as they mature; (vii) discontinues business; or (viii) is generally unable to pay its debts as they become due.

(j) The commencement of foreclosure or forfeiture proceedings, whether voluntary, by judicial proceeding, repossession, or any other method, by any creditor or any governmental agency against any Collateral, or the garnishment of any account Borrower or any Guarantor maintains with Lender;

(k) The actual or threatened (i) installation, storage, treatment, generation, manufacture, or use of Hazardous Substances on, under, or about any of the Collateral in violation of Environmental Laws or any other applicable law, regulation, or ordinance; or (ii) disposal, discharge, or release of Hazardous Substances on, under, about, or from any of the Collateral;

(l) If Borrower or Guarantor sells, leases, or otherwise transfers or conveys any of the Collateral, or any interest therein without Lender's prior written consent, unless otherwise as permitted by this Agreement and the Loan Documents.

(m) Borrower and Guarantor fail to comply with the terms and provisions of the SBA Loan Authorization.

(n) Any material uninsured damage to, or loss, theft, or destruction of, any of the Collateral occurs;

(o) The loss, suspension, revocation or failure to renew any license or permit now held or hereafter acquired by Borrower or Guarantor which loss, suspension, revocation or failure to renew might have a material adverse effect on the business profits, assets or financial condition of Borrower or Guarantor;

(p) Any change in ownership, management or control of Borrower without the express prior written consent of Lender; or

(q) The death or legal incompetence of an individual Borrower or Guarantor and an adequate replacement satisfactory to Lender is not substituted in lieu thereof within ninety (90) days.

Upon the occurrence of an Event of Default under this Agreement, the Note or any of the Loan Documents, Lender shall (i) give written notice to Borrower of a monetary default, and Borrower shall have a period of 15 days thereafter to cure such monetary Event of Default; and (ii) give written notice to Borrower of a non-monetary default and Borrower shall have a period of 30 days thereafter to cure such non-monetary Event of Default. Lender shall have no obligation to provide more than three (3) written default notices to the Maker within any given calendar year. Notwithstanding any other provision of this Agreement, the Note or any of the Loan Documents, if any provision of applicable law requires that Borrower be granted a longer notice period or a greater opportunity to cure, that provision of law shall control; provided, however, that the applicable notice period set forth herein shall run concurrently with the notice period required by law.

## ARTICLE VI
## REMEDIES ON EVENT OF DEFAULT

6.1     DECLARE NOTE DUE. Upon the occurrence of an Event of Default as defined in this Agreement, the Note or the Loan Documents, Lender may declare the entire unpaid balance of the Note and all other indebtedness of Borrower to Lender, including but not limited to accrued interest, fees and other costs to be immediately due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived.

6.2     ADDITIONAL REMEDIES. Upon the occurrence an Event of Default as defined in this Agreement, the Note or the Loan Documents, Lender may, in addition to declaring the entire unpaid balance of the Note and all other indebtedness of Borrower to Lender immediately due and payable, take any and all such other actions deemed necessary in the sole and absolute discretion of Lender, including, but not limited to the following: (i) foreclose upon Lender's security instruments upon the Collateral, in any manner and order available under law and as Lender may determine in its sole and absolute discretion; (ii) Enter the premises occupied by Borrower or Guarantor and take possession of the Collateral: (iii) cease further disbursements of proceeds from the Loan; (iv) expend any such funds necessary to remedy the Event of Default, with such amounts expended by Lender being added to the indebtedness secured by the Note; (v) exercise each and every right and remedy granted to Lender under this Agreement, the Note, the Loan Documents and under any other applicable law or at equity; and (vi) exercise any and all rights of setoff which Lender may have against any account, fund or property of any kind, tangible or intangible owned by Borrower or Guarantor.

6.3     DISPOSITION OF COLLATERAL. Lender shall have the right to sell, lease or otherwise dispose of the Collateral following an Event of Default, the proceeds of which will be applied against the amounts owed under this Agreement, the Note and the Loan Documents. Lender, in its sole and absolute discretion, may (i) accept any form of consideration in exchange for the Collateral; (ii) purchase all or any part of the Collateral at public or, if permitted by law, private sale; and (iii) remove and store the Collateral at Borrower's sole cost and expense. Prior to any sale of the Collateral, Lender will provide Borrower and Guarantor at least five (5) business days' notice prior to such proposed action, which shall constitute fair and reasonable notice. Proceeds from any disposition of the Collateral shall be applied in such order as Lender may determine against the following:

(a)     Towards the costs and expenses of taking, storing, preserving, transporting, insuring, repairing, holding and selling the Collateral, including any legal costs and attorney's fees;

(b)    Towards the expenses of satisfying any liens, security interest or encumbrances on or in the Collateral which may be prior to the lien or security interest of Lender.

(c)    To unpaid interest, then to unpaid principal, due to Lender under the Note along with any other indebtedness due from Borrower to Lender.

6.4    RIGHT OF SETOFF. Following an Event of Default, to the extent permitted by applicable law, Lender shall have a right of setoff, and a lien and security agreement against any and all of Borrower's and Guarantor's accounts with Lender, including but not limited to any balance of any deposit, trust or agency account, or any other bank account with Lender. Lender may administratively freeze all such accounts to protect its rights under this Agreement.

6.5    RELATIONSHIP TO STATE LAW. Notwithstanding any other provision of this Agreement, the Note or the Loan Documents, if any provision of applicable law requires that Borrower be granted a longer notice period or a greater opportunity to cure, that provision of law shall control; provided, however, that the applicable notice period set forth in this Agreement, the Note or the Loan Documents shall run concurrently with the notice period required by law.

6.6    REMEDIES NOT CUMULATIVE. The rights, remedies, powers and privileges provided for in this Agreement shall not be deemed exclusive but shall be cumulative and shall be in addition to all other rights, remedies, powers and privileges in Lender's favor at law or in equity.

6.7    NO WAIVER. Neither the failure nor delay on the part of Lender to exercise any right, remedy, power or privilege under this Agreement, the Note or the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege of Lender. No waiver of any Event of Default shall affect any later Event of Default or otherwise impair any rights of Lender. No single, partial or full exercise of any rights, remedies, powers and privileges by the Lender shall preclude further or other exercise thereof. No course of dealing between Lender and Borrower or Guarantor shall operate as or be deemed to constitute a waiver of Lender's rights under this Agreement, the Note or the Loan Documents or affect the duties or obligations of Borrower to Guarantor thereunder.

*ARTICLE VII*
COLLATERAL

7.1    COLLATERAL. As security for the full and timely payment and performance under this Agreement, the Note and the Loan Documents, Borrower and Guarantor have granted Lender a security interest in the following (the "Collateral"):

(a)    A first security interest lien against all equipment, fixtures, trade fixtures, inventory, accounts, instruments, chattel paper, general intangibles, documents, farm products, deposit accounts, and investment property owned by 31014 UNION CITY BLVD LLC and UNION CITY VETERINARY CORPORATION, whether now owned or hereafter acquired, wherever located, as evidenced by the SBA Security Agreement executed of even date by and between Lender and 31014 UNION CITY BLVD LLC and UNION CITY VETERINARY CORPORATION, as perfected by the UCC Financing Statement in favor of Lender.

(b)    A first lien position in the real property and improvements known as 31014 UNION CITY BOULEVARD, UNION CITY, CALIFORNIA 94587, as evidenced by the security instrument executed of even date by and between Lender and 31014 UNION CITY BLVD LLC, which is to be recorded in the real property records of Alemeda County, State of CALIFORNIA.

(c)    A third lien position in the real property and improvements known as 2836 ADELINE DRIVE, BURLINGAME, CALIFORNIA 94010, as evidenced by the security instrument executed of even date by and between Lender and MING KUN ZHOU and MARK ALAN DOTY II, which is to be recorded in the real property records of SAN MATEO County, State of CALIFORNIA.

The above-defined Collateral shall include all property used to secure the Loan, whether now owned or hereafter acquired, and shall continue in full force and effect until the Loan has been repaid in full. It is the express intent of Borrower and Guarantor that all of the Collateral shall not only secure the obligations of Borrower and Guarantor under this Agreement, the Note and the Loan Documents, but shall also secure any and all present and future obligations of Borrower and Guarantor to Lender.

## ARTICLE VIII
## MISCELLANEOUS

8.1    INTEGRATED AGREEMENT.    This Agreement, together with the Note and Loan Documents, constitute the entire understanding and agreement of the parties as to the matters set forth herein. The Loan Documents shall be construed as integrated and complementary of each other, and as augmenting and not restricting Lender's rights, powers, remedies and security. The Loan Documents supersede all prior statements, agreements and understandings between the parties with respect to the Loan.

8.2    AMENDMENTS AND APPROVALS. No amendment of any provision of this Agreement, the Note, or any of the Loan Documents, nor consent by Lender to Borrower for any departure thereof, shall be effective unless the same shall be in writing and signed by Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Further, notwithstanding anything to the contrary in this Agreement, the Note or the Loan Documents, any right Lender has under this Agreement, the Note or the Loan Documents to request, approve, accept, determine, decide, reserve rights, or make any judgment on any matter or issue shall be in Lender's sole and absolute discretion.

8.3    NOTICES. Any and all notices, elections or demands permitted or required to be given under this Agreement, the Note and the Loan Documents shall be in writing, signed by or on behalf of the party giving such notice, election or demand, and shall be deemed to have been properly given and shall be effective upon being personally delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt required, and shall be deemed to have been received on the earlier of the date shown on the receipt or three (3) business days after the postmarked date thereof, to the other party at the address of such other party set forth below or such other address within the continental United States as such other party may designate by specifically designating as a notice of change of address and given in accordance herewith. No notice of change of address shall be effective until the date of receipt thereof. Personal delivery

to a partner or any officer, partnership, agent or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been given shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

If given to Lender:

LIVE OAK BANKING COMPANY
1741 TIBURON DRIVE
WILMINGTON, NC 28403

Copy *(does not constitute notice)* to:

DAVIS, PICKREN, SEYDEL & SNEED
2300 MARQUIS TWO TOWER
285 PEACHTREE CENTER AVENUE, N.E.
ATLANTA, GEORGIA 30303
ATTN: WILLIAM TERRY PICKREN

If given to Borrower:

31014 UNION CITY BLVD LLC
31014 UNION CITY BOULEVARD
UNION CITY, CALIFORNIA 94587
ATTN: MARK DOTY

UNION CITY VETERINARY
CORPORATION
31014 UNION CITY BOULEVARD
UNION CITY, CALIFORNIA 94587
ATTN: MARK DOTY

Copy *(does not constitute notice)* to:

NEW TECH LAW GROUP
40815 GRIMMER BOULEVARD
FREMONT, CALIFORNIA 94538
Attn: MARK HIRSCH

If given to Guarantor:

MARK ALAN DOTY II
10405 ANN ARBOR AVENUE
CUPERTINO, CALIFORNIA 95014

DEBRA CHEN
59 S 17TH STREET
SAN JOSE, CALIFORNIA 95112

GURDIP SINGH
802 KEVENAIRE DRIVE
MILPITAS, CALIFORNIA 95035

With a copy to:

NEW TECH LAW GROUP
40815 GRIMMER BOULEVARD
FREMONT, CALIFORNIA 94538
Attn: MARK HIRSCH

8.4    GOVERNING LAW AND PARTIES BOUND. This Agreement, the Note and the Loan Documents shall be governed by and construed in accordance with the laws of the State of North Carolina, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Collateral, which matters shall be governed by the laws of the state in which such Collateral is located. However, in the event that the enforceability or validity of any provision of this Agreement, the Note or the Loan Documents is challenged or questioned, such provision shall be governed by which whichever applicable state or federal law would uphold or enforce such challenged or questioned provision. Borrower and Guarantor waive any objection which they may have based on lack of personal jurisdiction, improper venue or forum non conveniens.

8.5    NO ASSIGNMENT BY BORROWER. No commitment or other agreement issued by Lender to Borrower or Guarantor relating to the Loan nor any of Borrower's or Guarantor's rights under this Agreement, the Note or the Loan Documents shall be assignable by Borrower or Guarantor without the express prior written consent of Lender in its sole and absolute discretion.

8.6    SEVERABILITY. In the event that any clause or provisions of this Agreement, the Note or the Loan Documents is held to be invalid, illegal or unenforceable by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect the validity, legality or enforceability any of the remaining portions or provisions of this Agreement, the Note or the Loan Documents. If feasible, the offending provision shall be considered modified so that it becomes legal, valid, and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement, the Note or the Loan Documents, as the case may be.

8.7    TIME. Time is of the essence of this Agreement, the Note and the Loan Documents.

8.8    INCONSISTENCY WITH OTHER LOAN DOCUMENTS. In the event of any inconsistency between provisions contained within this Agreement, the Note and the Loan Documents, it is intended that the provisions of the SBA Loan Authorization shall be controlling. To the extent that such provisions of this Agreement, the Note or the Loan Documents cannot be reconciled with the provisions of the SBA Loan Authorization, the provisions of this Agreement shall control.

8.9    FORCE MAJURE. If Lender is delayed, hindered, or prevented from performing any act required under this Agreement by reason of war, governmental restrictions, civil commotion, shortage of labor or materials, strikes, fire, or any other reason beyond the control of Lender, the performance of such act shall be excused for the period of delay.

8.10    COUNTERPARTS. This Agreement, the Note and the Loan Documents may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

8.11    JOINT AND SEVERAL LIABILITY. If there is more than one Borrower or Guarantor, the liability of each Borrower and Guarantor under this Agreement shall be joint and several.

8.12    WAIVER OF RIGHT TO JURY TRIAL. BORROWER AND GUARANTOR WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT, THE NOTE AND LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER, GUARANTOR AND LENDER CONTEMPLATED IN THIS AGREEMENT, IN CONTRACT OR TORT OR OTHERWISE. BORROWER AND GUARANTOR ACKNOWLEDGE THAT THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT THEY FULLY UNDERSTAND ITS TERMS, CONTENT AND EFFECT, AND THAT THEY VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION.

8.13    NO FIDUCIARY RELATIONSHIP. The Lender has no fiduciary or other special relationship with or duty to Borrower, and none is created by this Agreement, the Note or the Loan Documents. Lender has no right to control the business, property, management, or operations of Borrower or Guarantor except as expressly provided in this Agreement, the Note and the Loan Documents.

8.14    INTERPRETATION. This Agreement is the result of negotiations between Borrower, Guarantor and Lender and their respective counsel. This Agreement shall not be applied, interpreted, or construed more strictly against a party because that party or their counsel drafted this Agreement.

8.15    LIMITATION OF LENDER'S RESPONSIBILITY. Each survey, inspection, appraisal or other report requested or required by Lender under this Agreement, the Note or in connection with the Loan shall be solely for Lender's own use and protection and not for the benefit or the protection of Borrower, Guarantor or any other person or entity. Borrower and Guarantor acknowledge and agree that Lender makes no warranty or representation as to the accuracy, completeness, or sufficiency of any such survey, inspection, appraisal or other report and neither Borrower, Guarantor nor any other person or entity may rely upon any such survey, inspection, appraisal or other report.

8.16    DEFINED TERMS. Capitalized words and terms have the meanings given to them in this Agreement, the Note and the Loan Documents. Accounting words and terms not otherwise defined in this Agreement, the Note and the Loan Documents shall have the meanings given to them in accordance with generally accepted accounting principles ("GAAP") as in effect on the date of this Agreement. All references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and words and terms used in the plural shall include the singular, as the context may require.

8.17    SURVIVAL. All covenants, agreements, representations and warranties made by Borrower and Guarantor in connection with the Loan shall survive the execution and delivery of this Agreement, the Note and the Loan Documents.

8.18    CAIVRS. Lender is required by the Debt Collection Improvement Act of 1996 and by the SBA to comply with the provisions of 31 U.S.C. §3711 and report information relating to the extension of the Loan to consumer or commercial reporting agencies or bureaus, as appropriate (collectively, the "Reporting Agencies"). The Borrower and Guarantor acknowledge this requirement and further, by execution of this Loan Agreement, agree that the Lender may in the future report further information concerning the Loan, including delinquent payments, other Loan defaults, or charge offs to Reporting Agencies. This information may be reflected in reports issued by Reporting Agencies. Further, Borrower and Guarantor acknowledge and agree that if the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, Lender is required to report any Loan charge offs to the Department of Treasury's delinquent debtor databases, including without limitation, to the Credit Alert Interactive Voice Response System ("CAIVRS") and Debt Check, which may affect their eligibility for further financial assistance.

8.19    SUCCESSORS AND ASSIGNS. All representations, warranties, covenants, and agreements by or on behalf of Borrower and Guarantor contained in this Agreement, the Note and the Loan Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.

8.20    WAIVER BY BORROWER. In connection with any proceeding under this Agreement, the Note and Loan Documents, including, without limitation, any action by Lender in foreclosure, repossession or other court process or in connection with any other action related to the Loan, Borrower waives (i) all benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof from attachment, levy or sale under execution; (ii) presentment for payment, demand, notice of demand, notice of non-payment, protest and notice of protest of the Note; (iii) any demand for possession of Collateral prior to commencement of any suit; and (iv) all rights to claim or recover attorney's fees and costs in the event that Borrower is successful in any action to remove, suspend or prevent the enforcement of a judgment entered by confession.

8.21    INDEMNIFICATION OF LENDER. Borrower and Guarantor agree to indemnify, defend, and hold Lender and its officers, directors, employees, and agents harmless from and against any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, reasonable attorneys', architect's, and engineering fees), demands, liabilities, penalties, fines, and forfeitures of any nature whatsoever and whenever made that may be asserted against or incurred by Lender or its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by, (i) this Agreement, the Note and the Loan Documents; (ii) a breach by Borrower or Guarantor of this Agreement, the Note or the Loan Documents; (iii) the exercise of the rights and remedies granted to Lender under this Agreement, the Note or the Loan Documents; or (iv) the use, generation, manufacture, storage, disposal, release, or threatened release of a Hazardous Substance on, under, about, or from the Collateral. Borrower releases and waives any future claims against Lender and its officers, directors, employees, and agents for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Law for the use, generation, manufacture, storage, disposal, release, or threatened release of a Hazardous Substance

on, under, about, or from the Collateral. The provisions of this Section 8.21 (i) shall survive the payment of the Note and the expiration, cancellation, or termination of this Agreement, and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise; and (ii) shall not apply against Lender's own gross negligence or willful misconduct, in which case Lender's liability shall be limited to only direct damages suffered and shall not extend to consequential or incidental damages.

8.22    SECURITIES AND EXCHANGE COMMISSION. There are no pending or threatened (to the best of Borrower's knowledge) audits by United States Securities and Exchange Commission ("SEC"). Further, there are no existing audit findings contained in an SEC deficiency letter or any other open audit findings of the SEC which have not been formally resolved or dismissed, other than those disclosed by Borrower to Lender in writing prior to the date hereof.

8.23    LENDER EXPENSES. Borrower agrees to pay upon demand any and all of Lender's reasonable costs and expenses, actually incurred, in connection the closing of the Loan or with the enforcement of this Agreement, the Note and the Loan Documents, whether or not an action or claim is filed. Such Lender costs and expenses include, but are not limited to, Lender's reasonable attorneys' fees and legal expenses incurred in connection with litigation, alternative dispute resolution proceedings, bankruptcy proceedings, appeals, anticipated post-judgment collection services, any fees or costs as may be directed by a court of competent jurisdiction, discharging or paying all taxes, liens, claims of lien, security interests, encumbrances, and other claims at any time levied or placed on the Collateral and paying all costs for insuring, maintaining, and preserving the Collateral. All such reasonable expenses actually incurred or paid by Lender as set forth herein will become part of the indebtedness secured by the Note and are payable on demand.

## ARTICLE IX
## CONSTRUCTION

9.1    CONSTRUCTION UPON PREMISES. All or a portion of the proceeds from the Loan shall be used for the    (the "Construction") upon the property known as 31014 UNION CITY BOULEVARD, UNION CITY, CALIFORNIA 94587 (the "Premises"). Borrower and MDC CONSTRUCTION, LLC. (the "General Contractor") have entered into that certain construction contract (the "Construction Contract") based upon certain plans and specifications which are detailed in the Construction Contract (the "Plans and Specifications") regarding the Construction upon the Premises. As used in this Agreement, the term "Construction Contract" shall include all contracts, subcontracts, agreements, documents, construction budgets and all other documentation relating to the Construction. Borrower agrees to fulfill its obligations under the Construction Contract and commence Construction upon the Premises within thirty (30) days following the date of this Agreement and shall diligently pursue same until substantial completion of the Construction in accordance with the Plans and Specifications, all of which shall be accomplished on or before ("Completion Date"). No Construction shall occur nor shall any materials be furnished to the Premises until (i) Lender's security interest(s) has been duly recorded and perfected; (ii) Lender has been provided satisfactory evidence that Borrower has obtained all insurance required under this Agreement; (iii) Lender's liens on the Premises and/or personal property located upon the Premises are valid perfected lien(s), subject only to such exceptions, if any, acceptable to Lender set forth in this Agreement; and (iv) all necessary permits and approvals from the appropriate

governmental authorities have been obtained. Borrower further transfers and assigns to Lender, all right, title, and interest of Borrower in and to the Construction Contract and the Plans and Specifications. Notwithstanding the foregoing, provided an Event of Default has not occurred under this Agreement, Borrower shall have all rights under the Construction Contract.

9.2    CONTRACTOR APPROVAL. Lender shall approve the General Contractor and all other contractors or subcontractors employed in connection with the Construction. Borrower shall maintain and furnish a list to Lender detailing contact information for the General Contractor and each contractor and subcontractor, the specific labor and materials to be supplied along with the value of same. Lender shall have the right to communicate with the General Contractor and all other contractors or subcontractors for any other purpose deemed reasonably necessary by Lender.

9.3    MODIFICATIONS AND CHANGE ORDERS. Borrower shall not permit, approve or allow any (i) modifications to the Plans and Specifications; or (ii) any change order(s) to the Construction Contract (collectively, a "Change Order"), other than minor changes involving no extra cost, without the prior consent of Lender and all required government authorities. If a Change Order is approved by Lender, Lender may require Borrower to deposit such funds in an amount equal to the additional cost of the Change Order with Lender, and such funds shall be disbursed prior to any Loan proceeds. Lender agrees to respond to any written requests for approval of Change Orders within ten (10) days of receipt of such written request accompanied by supporting documentation required by Lender.

9.4    DRAW REQUESTS. Lender's obligation to make a Loan disbursement (a "Disbursement") for Construction purposes shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Loan Documents. At such time as Borrower desires to obtain a Disbursement, Borrower and General Contractor shall complete, execute and deliver to Lender, and its construction monitoring firm, if applicable, a request for advance (a "Draw Request") in form and substance satisfactory to Lender. Each Draw Request shall be submitted on a standard American Institute of Architects ("AIA") payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require, including, but not limited to (i) documentation and reports evidencing the cost and progress of the Construction, including evidence that the undisbursed balance of the Loan is sufficient for the completion of the Construction in accordance with the Plans and Specifications; (ii) documents, certificates, releases and affidavits of Borrower, General Contractor and other such persons as Lender may require, including, but not limited to, interim lien waivers from the General Contractor and all sub-contractors, which confirm that as all labor, services and materials have been fully paid; (iii) if required by Lender, a written certification from the Lender's construction monitoring firm approving the Draw Request and confirming that they have inspected the Premises and that all Disbursements have been properly applied towards the costs of Construction in compliance with the Plans and Specifications and the Construction Contract; and (iv) any other such documentation as Lender may require. Borrower shall only submit a Draw Request with respect to work actually completed by the General Contractor in a good and workmanlike manner and for materials and equipment actually incorporated into the Premises in accordance with the Plans and Specifications. Each Draw Request shall be deemed a certification of Borrower that as of the date of such Draw Request, all representations and warranties contained in this Agreement are true and correct, and that Borrower is in compliance with all of the warranties and requirements of this Agreement.

9.5    DISBURSEMENTS. Lender shall make a Disbursement within ten (10) business days following its receipt of an approved Draw Request along with all supporting documentation required by this Agreement. All Draw Requests shall be made no more frequently than one (1) time per calendar month unless otherwise agreed to by Lender. Borrower hereby authorizes Lender to make any Disbursement in the manner required by Lender in its sole and absolute discretion, including, but not limited to, joint payee checks to the Borrower and the General Contractor, subcontractors, or suppliers, payments directly to the General Contractor, subcontractors or suppliers, and deposits into an account of Borrower. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement. Lender shall not be obligated to make a Disbursement following an Event of Default. Upon completion of the Construction and fulfillment of the Construction Contract, Lender shall make a Disbursement of available Loan proceeds towards the final payment due to the General Contractor upon delivery to Lender of the following (i) a completion notice, certificate of occupancy and/or other documentation evidencing that the Construction was completed in accordance with the Plans and Specifications and available for occupancy; (ii) evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work; (iii) a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Construction has been completed substantially in accordance with the Plans and Specifications and the Construction Contract; (iv) that direct connection has been made to all utilities set forth in the Plans and Specifications; and (vi) acceptance of the completed Construction by Borrower.

9.6    RETAINAGE. Lender may withhold up to ten percent (10.00%) of each Disbursement until the Construction has been fully completed in strict accordance with the Plans and Specifications (the "Retainage"). If no Event of Default has occurred and is continuing, Lender will release the Retainage upon satisfactory evidence that the Construction has been fully completed in strict accordance with the Plans and Specifications approved by Lender as set forth in Section 9.5 of this Agreement.

9.7    DEFICIENCY. If Lender at any time determines in its sole and absolute discretion that the remaining undisbursed Loan proceeds are not sufficient to complete the Construction in accordance with the Plans and Specifications (a "Deficiency"), then Borrower shall within five (5) days written notice from Lender, deposit with Lender an additional sum of money in an amount equal to the amount of the Deficiency. Lender shall not be obligated to make any future Disbursements for Construction purposes until Borrower has deposited such funds required by Lender to cure the Deficiency.

9.8    INSPECTION AND CONSTRUCTION DEFECTS. Lender and its agents shall have the right to inspect the Premises at any time without notice to Borrower, including all work done, labor performed, and materials furnished to the Premises. Borrower further agrees to keep and maintain accurate books, records and plans relating to the Construction upon the Premises and shall make same available to Lender upon demand. Lender may display a sign upon the Premises informing the public that Lender has provided construction financing. Borrower further agrees, upon demand by

Lender, to immediately correct any structural defects relating to the Construction upon the Premises or any departure from the Plans and Specifications approved by Lender.

9.9    LIENS. Borrower shall immediately notify Lender in writing if Borrower receives any notice (whether written or oral) of any of the following (i) a material adverse changes in the financial condition of the General Contractor; (ii) any litigation and claims, actual or threatened, affecting the Construction or the General Contractor; and (iii) claims from the General Contractor, subcontractors, laborers, suppliers, or workers of any kind stating that such party has not been paid for work performed or materials delivered in connection with the Construction; or (iv) any condition or event which constitutes a breach or default under any of the Loan Documents or any contract related to the Construction. If any lien is filed or asserted against the Premises, whether such lien is superior or inferior to the lien rights of Lender, Borrower shall promptly, and at its own cost and expense, pay the underlying claim in full or take such other action so as to cause same to be released or bonded to Lender's satisfaction. If Borrower fails to remove any lien on the Premises or provide a bond or deposit pursuant to this Agreement, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such payment and contest, including Lender's reasonable attorneys' fees. The failure of Borrower to release, remove or bond any such liens upon the Premises to the satisfaction of Lender shall constitute an Event of Default. Borrower shall not enter into any agreement other than the Construction Contract with respect or related to the Construction upon the Premises which could give rise to a lien against the Premises without the express prior written consent of Lender.

9.10    DAMAGE OR DESTRUCTION. If the Premises is damaged or destroyed by casualty of any nature, Borrower shall promptly restore the Premises to the condition existing prior to such damage or destruction with funds other than Loan proceeds. Lender shall not be obligated to make Disbursements under this Agreement until such restoration has been completed.

9.11    COMPLETION OF CONSTRUCTION BY LENDER. If Lender takes possession of the Premises, it may take any and all actions necessary in its judgment to complete the Construction, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Construction, it will not assume any liability to Borrower or to any other person for the manner or quality of the Construction, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Construction, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the Construction will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently

9.12    CONSTRUCTION EXPENSES. Borrower will pay all costs and expenses incurred in connection with or otherwise related to the Construction on demand, including, but not limited to (i)

all closing costs, loan fees; and disbursements; (ii) all expenses of Lender's legal counsel; and (iii) all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees. Any and all Expenditures of Lender in connection with the Construction shall be immediately due and payable from Borrower to Lender and shall become part of the Note.

9.13    LIMITATION OF LENDER RESPONSIBILITY. Neither Borrower nor the General Contractor or any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Disbursement. The making of any Disbursement by Lender shall not constitute or be interpreted as either (i) an approval or acceptance by Lender of the work done through the date of the Disbursement; or (ii) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Lender's inspection and approval of the Construction in accordance with the Plans and Specifications are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party.

9.14    COMPLIANCE. Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Construction. The Construction will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

9.15    ADDITIONAL REQUIREMENTS OF LENDER. The obligation of Lender to make the Loan to Borrower and to make future Disbursements for Construction purposes subsequent to the date of this Agreement is the following further conditions and requirements, as applicable:

(a)    Boundary line, foundation and as-built survey(s), as applicable, prepared in accordance with the "Minimum Detail Requirements for Land Title Surveys", as adopted by the ALTA and ACSM (2014) and certified by a licensed engineer acceptable to Lender. An as-built survey shall show the foundations of each structure located entirely within the property lines of the Premises (including all applicable setback requirements) which do not encroach upon, breach, or violate any building line, easement, code or similar restriction, and such other items and details as shall render the survey sufficient or permit the title company to eliminate its standard survey exception from its Title Policy.

(b)    An ALTA lender's title insurance policy (the "Title Policy") in an amount, in form and substance, and written by a title insurance company satisfactory to Lender insuring a valid lien position upon the Premises in accordance with this Agreement, along with any and all endorsements required by Lender. Prior to each Disbursement of the Loan, Lender shall be authorized to obtain, at Borrower's sole cost an expense, endorsement(s) to the Title Policy which (i) confirm that there has been no change in the status of title to the Premises; and (ii) increasing the coverage of the Title Policy up to the total amount then disbursed under the Note.

I      Performance and payment bond(s) in an amount equal to 100% of the amount of the Construction Contract, as well as a materialmen's and mechanics' payment bond, with such riders and supplements as Lender may require.

(d)    An appraisal of the Premises, Borrower's expense, including applicable regulatory and Lender requirements.

l    An environmental report and certificate, at Borrower's expense, on the Premises, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" section of this Agreement.

(f)    A soil report, at Borrower's expenses, for the Premises in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Premises is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

(g)    Evidence that the Premises is duly and validly zoned for the Construction on the Premises.

(h)    A builder's risk insurance policy, with extended coverage covering the Construction issued in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender insuring Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.

(i)    General Contractor general liability insurance, public liability and workmen's compensation insurance and all other insurance required by this Agreement or by the Loan Documents.

This Agreement is executed and entered into on ___11/6/2021___, 2021.

LENDER:

LIVE OAK BANKING COMPANY

BY: _____
    Frances B. Nun (Apply name)

TITLE: _____

BORROWER:

31014 UNION CITY BLVD LLC,
A California limited liability company

BY: _____
    MARK DOTY

TITLE: Manager

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

UNION CITY VETERINARY
CORPORATION,
A California corporation

BY: _____

MARK DOTY

TITLE:  Chief Executive Officer

Agreed and consented to on ____11/6/2021____, 2021.

GUARANTOR:

_____
MARK ALAN DOTY II, an individual

_____
DEBRA CHEN, an individual

_____
GURDIP SINGH, an individual

UNION CITY VETERINARY
CORPORATION,
A California corporation

BY:_____
    MARK DOTY

TITLE:  Chief Executive Officer


Agreed and consented to on _____November  05____, 2021.

GUARANTOR:


_____
MARK ALAN DOTY II, an individual

_____
DEBRA CHEN, an individual

_____
GURDIP SINGH, an individual

# EXHIBIT B

LOB Loan No. 111,470

<u>Memorandum to File</u>

**SBA Loan Name:**  Union City Pet Hospital

**SBA Loan #**: 16066491-09

**Borrower Name:**  31014 Union City Blvd LLC ; Union City Veterinary Corporation dba Union City Pet Hospital

**Approval Date:** September 9, 2021

**Date of Modification: July 26, 2022**

**Re: Correct terms.**

---

**The authorization currently states:**

Borrower must pay a total of 12 payments of interest only on the disbursed principal balance beginning two months from the month this Note is dated and every month thereafter; payments must be made on the 5th calendar day in the months they are due.

Borrower must pay principal and interest payments of $20,320.25 every month, beginning fourteen months from the month this Note is dated; payments must be made on the 5th calendar day in the months they are due.

**The authorization is being revised to state:**

Borrower must pay a total of 12 payments of interest only on the disbursed principal balance beginning **one month** from the month this Note is dated and every month thereafter; payments must be made on the 5th calendar day in the months they are due.

Borrower must pay principal and interest payments of $20,320.25 every month, beginning **thirteen months** from the month this Note is dates; payments must be made on the 5th calendar day in the months they are due.

**Reason:**  This needed to be corrected to match the SBA Note.

***In all other respects, the Authorization Agreement shall remain unchanged.***

LOB Loan No.  111,470

<u>Memorandum to File</u>

**SBA Loan Name:**  Union City Pet Hospital

**SBA Loan #**: 16066491-09

**Borrower Name:**  31014 Union City Blvd LLC ; Union City Veterinary Corporation dba Union City Pet Hospital

**Approval Date: September 9, 2021**

**Date of Modification: May 9, 2021**

**Re:** Appraisal Language and Construction Bond Language

---

**The authorization does not currently include the following language. This modification seeks to add the following appraisal language.**

**7. Appraisal**

Prior to disbursement, and in accordance with SOP 50 10, Lender must obtain:

a.  **Real Estate Appraisal** on the real property located at 31014 Union City Boulevard Union City, California 94587, showing a fair market value of at least $1,550,000 As-Is and $3,380,000 As-Complete.

**Reason**: This language is required when real estate is being purchased, refinanced, or improves with loan proceeds and is collateral for the loan.

*In all other respects, the Authorization Agreement shall remain unchanged.*

**The authorization does not currently include the following language. This modification seeks to add the following language:**

**(1)** Bonds – Evidence that the licensed contractor has furnished a 100% performance bond and labor and materials payment bond. Only a corporate surety approved by the Treasury Department using an American Institute of Architect's form or comparable coverage may issue these bonds. Only borrower may be names as oblige on the bonds.

**Reason:** Per SBA, when a loan has a construction component more than $350,000, the construction bonds language should be included in the authorization.

*In all other respects, the Authorization Agreement shall remain unchanged.*



U.S. Small Business
Administration

# U.S. Small Business Administration
# AUTHORIZATION
# (SBA 7(A) GUARANTEED LOAN)

| SBA Loan # | 16066491-09 |
|---|---|
| SBA Loan Name | Union City Pet Hospital |
| Approval Date | September 9, 2021 |

Lender:
Live Oak Banking Company
1741 Tiburon Drive
Wilmington, North Carolina 28403

U. S. Small Business Administration (SBA):
Fresno Commercial Loan Servicing Center
Office of Financial Program Operations
801 R Street, Suite 101
Fresno, California  93721-1547

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received September 9, 2021, for SBA to guaranty 90% of a loan ("Loan") in the amount of $3,790,000.00 to assist:

Borrower (EPC):

31014 Union City Blvd LLC
31014  Union City  Boulevard
Union City, California 94587

Operating Company:

Union City Veterinary Corporation
dba Union City Pet Hospital
31014  Union City  Boulevard
Union City, California 94587

All requirements in the Authorization which refer to Borrower also apply to any Co-Borrower.

## A.   THE GUARANTY FEE IS $0.00
Lender must pay the guaranty fee within 90 days of the approval date of this Authorization. Failure to timely pay the guaranty fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guaranty fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan, except when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account. Borrower may use Loan proceeds to reimburse Lender for the guaranty fee.   For loans of $150,000 or less, Lender may retain 25% of any required guaranty fee but must remit the remainder to SBA.

## B.   ON-GOING GUARANTY FEE (Lender's Annual Service Fee):
1.   Lender agrees to pay SBA an on-going guaranty fee equal to 0.000 of one percent per year of the guaranteed portion of the outstanding balance.
2.   Lender may not charge or otherwise pass through this fee to Borrower.

## C. IT IS LENDER'S SOLE RESPONSIBILITY TO:

1. Close the Loan in accordance with the terms and conditions of this Authorization.
2. Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.
3. Retain all Loan closing documents. Lender must submit these documents, along with other required documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

## D. REQUIRED FORMS

1. Lender may use its own forms except as otherwise instructed in this Authorization. Lender must use the following SBA forms for the Loan:
   NOTE: LENDER MAY USE ITS OWN FORM NOTE AND GUARANTEE AGREEMENTS IN LIEU OF THE SBA NOTE AND GUARANTEE AGREEMENTS. IF LENDER USES ITS OWN NOTE AND/OR GUARANTEE FORMS, LENDER MUST ENSURE THE DOCUMENTS COMPLY WITH THE REQUIREMENTS SET FORTH IN SOP 50-10.
   
   SBA Form 147, Note or Lender's own Note that complies with SOP 50 10
   SBA Form 1050, Settlement Sheet
   SBA Form 159, Compensation Agreement, for each required agent
   SBA Form 722, Equal Opportunity Poster
   SBA Form 148, Guarantee
   SBA Form 148L, Limited Guarantee
   SBA Form 601, Agreement of Compliance
2. Lender may use computer-generated versions of mandatory SBA Forms, as long as the text is identical.
3. Lender must submit a copy of each completed SBA Form 159 by email to the SBA fiscal and transfer agent after initial disbursement and in conjunction with Lender's 1502 Report for the month. Lender must maintain each original SBA Form 159 in its file.

## E. CONTINGENCIES—SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents. The guarantee is contingent upon Lender:

1. Having and complying with a valid SBA Loan Guarantee Agreement (SBA Form 750, SBA Form 750B for short-term loans, or 750CA for Community Advantage (CA) loans, if applicable) and any required supplemental guarantee agreements, between Lender and SBA;
2. Having paid the full guaranty fee in the time and manner required by this Authorization and SBA Loan Program Requirements;
3. Complying with the current SOP 50 10 and all applicable appendices;
4. Completing disbursement no later than 48 months from the approval date of this Authorization. (The loan must be fully disbursed within 48 months from the date of this Authorization. Any undisbursed balance remaining after 48 months will be automatically cancelled by SBA.);
5. Having no evidence since the date of the Loan application, or since any preceding disbursement, of any unremedied adverse change in the financial condition, organization, management, operation, or assets of Borrower or Operating Company which would warrant withholding or not making any further disbursement; and,
6. Satisfying all of the conditions in this Authorization.

## F. NOTE TERMS

1. **Maturity**: This Note will mature in 26 years from date of Note.
2. **Repayment Terms.**

SBA Loan Number: 16066491-09                                    Page 2
SBA Loan Name: Union City Pet Hospital

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand. The Note must include the following language:

> "When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing.

The initial interest rate is 4.15% per year for 5 years. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 0.90%. The interest rate on this Note will then begin to fluctuate as described below. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 12 payments of interest only on the disbursed principal balance beginning two months from the month this Note is dated and every month thereafter; payments must be made on the 5th calendar day in the months they are due.

Borrower must pay principal and interest payments of $20,320.25 every month, beginning fourteen months from the month this Note is dated; payments must be made on the 5th calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal. The interest rate will be adjusted every calendar quarter (the "change period"), beginning January 1, 2027 (date of first rate adjustment).

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 0.90% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

SBA Loan Number: 16066491-09                                                          Page 3
SBA Loan Name: Union City Pet Hospital

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

**Subsidy Recoupment Fee.** When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee as follows:
a. During the first year after the date of initial disbursement, 5% of the prepayment amount;
b. During the second year after the date of initial disbursement, 3% of the prepayment amount; and
c. During the third year after the date of initial disbursement, 1% of the prepayment amount.

All remaining principal and accrued interest is due and payable 26 years from date of Note. Late Charge: If a payment on this Note is more than 15 days late, Lender may charge Borrower a late fee of up to 4% of the unpaid portion of the regularly scheduled payment.

3. Lender must include in the Note the following language for residential property located in California:

*"Borrower acknowledges this Note is secured by a Deed of Trust in favor of Lender on real property located in SAN MATEO County, State of California. That Deed of Trust contains the following due-on-sale provision: "DUE ON SALES CLAUSE. Trustor shall not sell, convey or otherwise transfer any ownership interests or right in any part or all of the Property, whether voluntary or involuntary, without first fully paying and satisfying the Indebtedness (collectively, a "Prohibited Transfer").*

## G. USE OF PROCEEDS

| | |
|---|---|
| $1,249,895.00 | To purchase land and improvements located at 31014 Union City Boulevard, Union City, California 94587 |
| $2,078,333.00 | To make renovations to the building located at 31014 Union City Boulevard, Union City, California 94587 |
| $127,372.00. | For interest reserve |
| $20,000.00 | To purchase inventory |

SBA Loan Number: 16066491-09                                              Page 4
SBA Loan Name: Union City Pet Hospital

|  |  |
|---|---|
| $175,000.00 | To purchase equipment |
| $10,000.00 | To pay supervision fee |
| $129,400.00 | For working capital and closing costs |

All amounts listed above are approximate. Lender may not disburse Loan proceeds solely to pay the guaranty fee. Lender may disburse to Borrower, as working capital only, funds not spent for the listed purposes as long as those funds to not exceed 20% of the specified purpose authorized or $50,000.00, whichever is less. An Eligible Passive Company may not receive working funds or funds to be used for the purchase of other assets, including intangible assets, for the Operating Company's use.

The loan must be made for a sound business purpose and must benefit the small business, and one 7(a) loan may not be split into two 7(a) loans merely to benefit the Lender. 13 CFR 120.120 and 120.130(f).

Lender must document that Borrower used the loan proceeds for the purposes stated in this Authorization. Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must complete and sign SBA Form 1050 at the time of first disbursement. Lender must document the first and all subsequent disbursements by attaching required documentation to the original SBA Form 1050 and must maintain the documentation in the Loan file, following the procedures described in SOP 50 10.

## H. COLLATERAL CONDITIONS

Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions.

The following language must appear in Lender's Guarantee when Lender uses its own Guarantee.

*"When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

1. **Shared First Deed of Trust** (including due on sale clause, water rights, if any and assignment of rents) on land and improvements located at 31014 Union City Boulevard, Union City, California 94587. This property is commercial.
   a. Subject to no other liens.
   b. The lien securing the Loan is a shared lien pari passu with Live Oak Banking Company in the amount of $225,000.00.
   c. Written waiver of redemption rights is required.
   d. Evidence of title and priority of lien must be based upon:
      (1) ALTA Loan Policy, insuring lender and assigns, policy to be without standard exceptions ("extended ALTA") and without arbitration clause.
2. **Shared First Perfected Security Interest,** in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located: Equipment; Fixtures; Inventory; Accounts; Instruments; Chattel Paper; Documents and General Intangibles.

SBA Loan Number: 16066491-09        Page 5
SBA Loan Name: Union City Pet Hospital

a.  Subject to no other liens.

b.  The lien securing the Loan is a shared lien pari passu with Live Oak Banking Company in the amount of $225,000.00.

c.  Lender must obtain a written agreement from all Lessors (including sublessors) agreeing to: (1) Subordinate to Lender Lessor's interest, if any, in this property; (2) Provide Lender written notice of default and reasonable opportunity to cure the default; and (3) Allow Lender the right to take possession and dispose of or remove the collateral.

d.  Lender must obtain a list of all equipment and fixtures that are collateral for the Loan. For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

e.  Lender must obtain an appropriate Uniform Commercial Code lien search evidencing all required lien positions. If UCC search is not available, another type of lien search may be substituted.

3.  **Guarantee on SBA Form 148** or equivalent lender's form, by Mark Alan Doty II, resident in California. Secured by:

a.  **Shared Third Deed of Trust** (including due on sale clause, water rights, if any and assignment of rents) on land and improvements located at 2836 Adeline Drive, Burlingame, California 94010. This property is residential.

(1)  Subject only to prior lien(s) in favor of
   (a)  First: Wells Fargo Bank, N.A. in the amount of $1,600,000.00.
   (b)  Second: ZB, N.A., dba California Bank & Trust in the amount of $300,000.00.

(2)  The lien securing the Loan is a shared lien pari passu with Live Oak Banking Company in the amount of $225,000.00.

(3)  Written waiver of homestead required.

(4)  Evidence of title and priority of lien must be based upon:
   [a]  ALTA Loan Policy, insuring lender and assigns, policy to be without standard exceptions ("extended ALTA") and without arbitration clause.

4.  **Guarantee on SBA Form 148** or equivalent lender's form, by Debra Chen, resident in California.

5.  **Guarantee on SBA Form 148** or equivalent lender's form, by Gurdip Singh, resident in California.

6.  **Limited Guarantee on SBA Form 148L** or equivalent lender's form, by Ming Kun Zhou, resident in California.
   **COLLATERAL/RECOURSE:** The guarantee is limited to the amount Lender obtains from the following Collateral pledged by Guarantor: 2836 Adeline Drive, Burlingame, California 94010.

7.  **Limited Guarantee on SBA Form 148L** or equivalent lender's form, by Warm Springs Veterinary Corporation, resident in California.
   **TIME:** The guarantee is of all amounts owing under the Note. The guarantee will continue until 2 years after the date of the Note (the "Guarantee Period"). If Borrower is in default at the end of the Guarantee Period, the guarantee will continue until all defaults are cured.

8.  **Assignment of Rents from Eligible Passive Company.** Lender must obtain a perfected assignment of all rents paid under the lease between the Eligible Passive Company and the Operating Company. The term of lease, with options to renew exercisable solely by the Operating

---

SBA Loan Number: 16066491-09                                    Page 6
SBA Loan Name: Union City Pet Hospital

Company, must be for at least the term of the Loan. The lease must be in writing and subordinate to Lender's Security Interest, Deed of Trust or Mortgage. Lease payments must be no more than is necessary to amortize debt plus pay expenses related to holding the property.

If in acquiring the property the Eligible Passive Company becomes the beneficiary or owner of the right to an existing mineral lease on the property, the Eligible Passive Company must assign its interest in the lease (together with its rights to all rental, mineral, royalty, bonus, or similar lease payments that might accrue by virtue of the existing mineral (oil and gas) lease to the Operating Company; and any such assignment must be subordinated to all Deeds of Trust or Mortgages. In addition, the Lender must take the additional actions described in SOP 50 10 as applicable.

The following language must appear in all security instruments including Mortgages, Deeds of Trust, and Security Agreements:

*"The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:*
*a)   When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.*
*b)   Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*
*c)   Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."*

California Mandatory Provision—The following language must appear in California guarantees if any borrower, guarantor, or any real estate is located in California:

*"Guarantor waives its rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive.*

*The guarantor waives all rights and defenses that the guarantor may have because the debtor's debt is secured by real property. This means, among other things:*

*(1) The creditor may collect from the guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.*

*(2) If the creditor forecloses on any real property collateral pledged by the debtor:*
*(A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.*
*(B) The creditor may collect from the guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right the guarantor may have to collect from the debtor.*

*This is an unconditional and irrevocable waiver of any rights and defenses the guarantor may have because the debtor's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.*

SBA Loan Number:  16066491-09                                                      Page 7
SBA Loan Name: Union City Pet Hospital

*The guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise."*

*If Guarantee is secured by Deed of Trust on residential property in California, Lender must also include in the guarantee the following language:*

*"Guarantor acknowledges that this Guarantee is secured by a Deed of Trust in favor of Lender on real property located in* SAN MATEO *County, California. That Deed of Trust contains the following due-on-sale provision: DUE ON SALES CLAUSE. Trustor shall not sell, convey or otherwise transfer any ownership interests or right in any part or all of the Property, whether voluntary or involuntary, without first fully paying and satisfying the Indebtedness (collectively, a "Prohibited Transfer")."*

## I.  ADDITIONAL CONDITIONS

1. **Insurance Requirements.**  Prior to disbursement, Lender must require Borrower to obtain the following insurance coverage and maintain this coverage for the life of Loan:
    a. **Flood Insurance.**  Based on the Standard Flood Hazard Determination (FEMA Form 086-0-32):
        i. If any portion of a building that is collateral for the Loan is located in a special flood hazard area, Lender must require Borrower to obtain flood insurance for the building under the NFIP.
        ii. If any equipment, fixtures, or inventory that is collateral for the Loan ("Personal Property Collateral") is in a building any portion of which is located in a special flood hazard area and that building is collateral for the Loan, Lender must require Borrower to also obtain flood insurance for the Personal Property Collateral under the NFIP.
        iii. If any Personal Property Collateral is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the Loan, Lender must require Borrower to obtain available flood insurance for the Personal Property Collateral. Lender may waive this requirement when the building is not collateral for the Loan if it uses prudent lending standards and includes in the Loan file a written justification that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

        Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001 et seq.), whichever is less. ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.) Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender and SBA. (Borrower will be ineligible for any future SBA disaster assistance or business loan assistance if Borrower does not maintain any required flood insurance for the entire term of the Loan.)
    b. **Real Estate Hazard Insurance** coverage (including any required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all real estate that is collateral for the Loan in the amount of the full replacement cost. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a MORTGAGEE

SBA Loan Number:  16066491-09                                                    Page 8
SBA Loan Name:  Union City Pet Hospital

CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the mortgagor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

   c. **Personal Property Hazard Insurance** coverage (including required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all equipment, fixtures or inventory that is collateral for the Loan, in the amount of full replacement costs. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a LENDER'S LOSS PAYABLE CLAUSE in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

   d. **Liability Insurance** in an amount and with an insurance company satisfactory to Lender.

## 2. Environmental Requirements

   a. Lender may not disburse the Loan until it has:
      i. Completed the review for potential environmental contamination required in SOP 50 10 on each commercial real property site taken as collateral; and
      ii. Sufficiently minimized the risk from any adverse environmental findings discovered in the Environmental Investigation, or otherwise, as required by SOP 50 10 and applicable appendices.

   b. Lender should consult with the local SBA office where the real property is located to ascertain any state or local environmental requirements.

## 3. Borrower, Guarantor and Operating Company Documents

   a. Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current copy of each of the following as appropriate:

      i. **Corporate Documents** - Articles or Certificate of Incorporation (with amendments), any By-laws, Certificate of Good Standing (or equivalent), Corporate Borrowing Resolution, and, if a foreign corporation, current authority to do business within this state.

      ii. **Limited Liability Company (LLC) Documents** - Articles of Organization (with amendments), Fact Statement or Certificate of Existence, Operating Agreement, Borrowing Resolution, and evidence of registration with the appropriate authority.

      iii. **General Partnership Documents** - Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable.

      iv. **Limited Partnership Documents** - Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable, Certificate of Limited Partnership, and evidence of registration with the appropriate authority.

      v. **Limited Liability Partnership (LLP) Documents** - Partnership Agreement, Certificate as to Partners, Certificate of Partnership or Good Standing (or equivalent) as applicable, and evidence of registration with the appropriate authority.

      vi. **Trustee Certification** - A Certificate from the trustee warranting that:
        a) The trust will not be revoked or substantially amended for the term of the Loan without the consent of Lender/SBA;
        b) The trustee has authority to act;
        c) The trust has the authority to borrow funds, guarantee loans, and pledge trust assets;
        d) If the trust is an Eligible Passive Company, the trustee has authority to lease the property to the Operating Company;

  e) There is nothing in the trust agreement that would prevent Lender from realizing on any security interest in trust assets;

  f) The trust agreement has specific language confirming the above; and

  g) The trustee has provided and will continue to provide Lender/SBA with a true and complete list of all trustors and donors.

 vii. **Trade Name** - Documentation that Borrower has complied with state requirements for registration of Borrower's or Operating Company's trade name (or fictitious name), if one is used.

 b. Prior to closing, Lender must obtain from Borrower and Operating Company:

  i. **Ownership** - Evidence that ownership and management have not changed without Lender's approval since the application was submitted.

  ii. **Purchase-Sale Agreement** – Executed Purchase-Sale Agreement.

4. **Operating Information**

Prior to any disbursement of Loan proceeds, Lender must obtain:

 a. **Verification of Financial Information** - Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain federal income tax information on Borrower, or the Operating Company if the Borrower is an EPC, for the last 3 years (unless Borrower or Operating Company is a start-up business). If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation. This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes. Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the Loan application and relied upon in approving the Loan. Borrower must resolve any significant differences to the satisfaction of Lender and SBA. Failure to resolve differences may result in cancellation of the Loan.

If the Loan involves a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

If the IRS responds and the transcript reflects "Record not Found" for any tax year, Lender must follow the procedures detailed in SOP 50 10 to determine what steps must be taken to satisfy the SBA tax verification requirement.

If Lender is processing a loan under its delegated authority and does not receive a response from the IRS or copy of the tax transcript within 10 business days of submitting the IRS Form 4506-T, then Lender may close and disburse the loan provided that Lender sends a second request following precisely the procedures detailed in SOP 50 10 and Lender performs the verification and resolves any significant differences discovered, even if the Loan is fully disbursed.

 b. **Authority to Conduct Business** - Evidence that Borrower and Operating Company have an Employer Identification Number and all insurance, licenses, permits and other approvals necessary to lawfully operate the business, including, but not limited to, the ability to operate at the business location.

 c. **Flood Hazard Determination** - A completed Standard Flood Hazard Determination (FEMA Form 086-0-32).

 d. **Lease** – Current lease(s) on all business premises where collateral is located, with a term, including options, at least as long as the term of the Loan.

5. **Injection**

Lender must obtain evidence that prior to disbursement:

 a. **Cash Injection**—At least $450,000.00 cash has been injected into the project. This cash is purchase land. The source of the cash is Personal Funds.

---

6. **Construction Provisions**

    i.    **Building Standards**—In the construction of a new building or an addition to an existing building, the construction must conform with the "National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings" (NEHRP), or a building code that SBA has identified as having substantially equivalent provisions. Lender must obtain from Borrower evidence of compliance with these requirements. Examples of evidence include a certificate issued by a licensed building architect, construction engineer or similar professional, or a letter from a state or local government agency stating that an occupancy permit is required and that the local building codes upon which the permit is based include the Seismic standards.

    ii.    Lender may charge Borrower a one-time fee not to exceed 2% of the portion of the Loan designated for construction. The actual fee must not exceed the cost of the extra service.

    iii.    Prior to closing, if an "as completed" appraisal was obtained prior to construction and the SBA guaranteed loan was not used to cover the construction period, Lender must obtain a statement from the appraiser, general contractor, project architect, or construction management firm after construction is completed that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based. If the Lender cannot obtain such a statement, then the lender may not close the loan without SBA's prior written permission.

        If the SBA guaranteed loan was used to cover the construction period, after construction is completed, Lender must notify the appropriate SBA CLSC of any deviation(s) and work with the SBA CLSC to determine an appropriate course of action, including securing additional collateral. Lender's notification to SBA must comply with SOP 50 10.

        If the appraiser is unable to issue a statement that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based, but is able to provide a new appraisal demonstrating that the market value meets or exceeds the original estimate of value, then no additional action by Lender is necessary.

    iv.    Prior to the commencement of any construction, Lender must obtain from Borrower

        a) **Insurance**—Evidence that licensed contractor carries appropriate Builder's Risk and Worker's Compensation Insurance.

        b) **Injection**—Evidence that Borrower has injected the required funds into the project prior to disbursement of the Loan, if Borrower is injecting funds into the construction project.

        c) **Plans and Specifications**—A copy of the final plans and specifications for Lender review.

        d) **Construction Contract**—One (1) copy of a Construction Contract with an acceptable licensed contractor at a specified price not to exceed $1,978,990.00. The contract must include an agreement that Borrower will not order or permit any material changes in the approved plans and specifications without prior written consent of Lender and the surety providing the required bonds.

    v.    **Lender must:**

        a) **Cost Overruns**—Obtain evidence of Borrower's ability to pay cost overruns or additional construction financing expenses prior to approving any contract modification. Lender and SBA are not obligated to increase the loan to cover cost overruns.

---

      b)  **Inspection**—Make interim and final inspections to determine that construction conforms to the plans and specifications.

      c)  **Codes and Permits**—Obtain evidence that the building, when completed, will comply with all state and local building and zoning codes, and applicable licensing and permit requirements.

      d)  **Compliance Form**—Obtain SBA Form 601, Applicant's Agreement of Compliance.

      e)  **Lien Waivers**—Obtain lien waivers or releases from all materialmen, contractors, and subcontractors involved in the construction.

      f)  **Construction Safeguards**—Take all normal other construction loan safeguards appropriate for the Loan.

7. **Certifications and Agreements**

   a.  Prior to Disbursement, Lender must require Borrower and Operating Company to certify that:

     (1)  **Receipt of Authorization** - Borrower and Operating Company have received a copy of the Authorization for this Loan from Lender, and acknowledge that:

        a.  The Authorization is <u>not</u> a commitment by Lender to make a loan to Borrower;

        b.  The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;

        c.  The Note will require Borrower to give Lender prior notice of intent to prepay.

        d.  If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guarantee. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.

        e.  Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

        f.  If the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the Credit Alert Verification Reporting System (CAIVRS) database, which may affect their eligibility for further financial assistance.

     (2)  That there has been no adverse change in Borrower's (and Operating Company's) financial condition, organization, operations or fixed assets since the date the Loan application was signed.

     (3)  **Child Support** – No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (1) administrative order, (2) court order, or (3) repayment agreement requiring payment of child support.

     (4)  **Current Taxes** – Borrower and Operating Company (if applicable) are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

     (5)  **Environmental** – For any real estate pledged as collateral for the Loan or where the Borrower or Operating Company (if applicable) is conducting business operations (collectively "the Property"):

        a.  At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

    b.   Borrower and Operating Company will continue to comply with these laws and regulations;

    c.   Borrower and Operating Company, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater under such Property, other than what was disclosed in connection with the Environmental Investigation of the Property;

    d.   Until full repayment of Loan, Borrower and Operating Company will promptly notify Lender and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Borrower or Operating Company or such Property are subject to any investigation or enforcement action by any federal, state, or local environment agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater;

    e.   As to any Property owned by Borrower or Operating Company, Borrower and Operating Company indemnifies, and agrees to defend and hold harmless Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's or Operating Company's operations. (Lender or SBA may require Borrower and Operating Company to execute a separate indemnification agreement.

b.   Prior to Disbursement, Lender must require Borrower and Operating Company to certify that they will:

   (1)  **Reimbursable Expenses** – Reimburse Lender for expenses incurred in the making and administration of the Loan.

   (2)  **Books, Records, and Reports –**
       a.   Keep proper books of account in a manner satisfactory to Lender;
       b.   Furnish year-end statements to Lender within 60 days of fiscal year end;
       c.   Furnish additional financial statements or reports whenever Lender requests them;
       d.   Allow Lender or SBA, at Borrower's or Operating Company's expense, to:
           [1]  Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition; and
           [2]  Inspect and appraise any of Borrower's and Operating Company's assets; and
           [3]  Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower or Operating Company, upon request by Lender or SBA.

   (3)  **Equal Opportunity** – Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to    employees, applicants for employment and the general public.

   (4)  **American-made Products** – To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

   (5)  **Taxes** – Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

   (6)  **Occupancy** - Comply with the following provisions: (a) Borrower must lease 100% of the Rentable Property to Operating Company; (b) Operating Company may sublease up to 49% of the Rentable Property for business or residential use; and (c) Operating Company will not use Loan proceeds to improve or renovate any of the Rentable Property that is to be sub-leased. Operating Company may provide up to 49% of the Rentable Property occupied by Operating Company for use by a resident owner or manager only if the nature of the business demands it.

---

(7) **Leasing** – During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state, or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

c. Borrower and Operating Company certify that they will not, without Lender's prior written consent:

(1) **Distributions** – Make any distribution of company assets that will adversely affect the financial condition of the Borrower and/or Operating Company.

(2) **Ownership Changes** – Change the ownership structure or interests in the business during the term of the Loan.

(3) **Transfer of Assets** – Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.

Borrower and Operating Company, if any, warrants and represents that all information provided to Lender, including without limitation, all information regarding the Borrower's and Operating Company's, if any, financial condition, is accurate to the best of its knowledge and that Borrower and Operating Company, if any, has not withheld any material information. Borrower and Operating Company, if any, acknowledges that for the purpose of this transaction, Lender is acting on behalf of SBA, an agency of the United States Government, except that SBA accepts no liability or responsibility for any wrongful act or omission by Lender. Borrower and Operating Company, if any, further acknowledges that any false statements to Lender can be considered a false statement to the federal government under U.S.C. § 1001, and may subject the Borrower and Operating Company, if any, to criminal penalties and that Lender and SBA are relying upon the information submitted by the Borrower and Operating Company, if any.

ADMINISTRATOR
SMALL BUSINESS ADMINISTRATION

September 9, 2021

BY: Robin Harper, AVP - Closing, Live Oak Banking Company, a preferred Lender, as Lender and as an agent of and on behalf of the SBA for purposes of executing this Authorization.

# EXHIBIT C

## Charlie Lehmann

| | |
|---|---|
| **From:** | Mark Doty <mdotydvm@gmail.com> |
| **Sent:** | Wednesday, January 25, 2023 5:34 PM |
| **To:** | Charlie Lehmann |
| **Subject:** | Re: FW: Draw #01 - Union City Animal Hospital |

Hello, this is Mark Doty with the Union City Pet Hospital project.  I've spoken with Dr. Singh.  Dr Chen is out of the country at the moment.  I approve the $385,031.25 payment to Regency.
Thanks

On Mon, Jan 23, 2023 at 10:35 AM Charlie Lehmann <charlie.lehmann@liveoak.bank> wrote:

Good Afternoon Dr. Chen,

Hope you all are doing well! Wanted to follow up on the below email and get your approval on releasing funds to Regency for the attached billing? We received the majority of backup documents we were looking for.

We did want to make sure you all were aware of the mobilization line item being billed for $220,189.00. This is higher then we typically see mobilization fees and wanted to get it on your radar for approval.

This is the one item we did not receive too much backup documents for and just wanted you all to be aware.

If you could approve/confirm total payment of $385,031.25 to Regency for the attached we will work to get payment released. Please let me know if you have any questions at all. Thank you!

1

## CONTINUATION SHEET

*AIA DOCUMENT G703*

AIA Document G702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: 1
APPLICATION DATE: 10/7/2022
PERIOD TO: 10/31/2022
ARCHITECT'S PROJECT NO: N/A

| A ITEM NO | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G÷C) | I BALANCE TO FINISH (C-G) | J RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Mobilization | 220,189.00 | - | 220,189.00 | - | 220,189.00 | 100% | - | 22,018.90 |
| 2 | Demolition | 88,803.00 | - | - | 25,000.00 | 25,000.00 | 28% | 63,803.00 | 2,500.00 |
| 3 | Concrete/ Masonry/ Structural Steel | 113,830.40 | - | - | - | - | 0% | 113,830.40 | - |
| 5 | Rough Carpentry/ Shear Framing | 312,750.00 | - | - | - | - | 0% | 312,750.00 | - |
| 6 | Woodwork, Casework/ Countertops | 156,840.00 | - | - | 67,728.00 | 67,728.00 | 43% | 89,112.00 | 6,772.80 |
| 7 | Doors/ Frames/ Hardware | 99,595.00 | - | - | - | - | 0% | 99,595.00 | - |
| 9 | Finishes (Drywall, T-bar, Flooring, Tile etc) | 299,977.50 | - | - | - | - | 0% | 299,977.50 | - |
| 10 | Miscellaneous | 19,545.60 | - | - | - | - | 0% | 19,545.60 | - |
| 11 | Elevator (Orion 17 Hydraulic) | 137,989.56 | - | - | 90,409.00 | 90,409.00 | 66% | 47,580.56 | 9,040.90 |
| 13 | Plumbing | 182,042.00 | - | - | - | - | 0% | 182,042.00 | - |
| 14 | HVAC Modifications & Controls | 115,400.00 | - | - | - | - | 0% | 115,400.00 | - |
| 15 | Electrical Systems and Lighting | 286,687.68 | - | - | - | - | 0% | 286,687.68 | - |
| 16 | Insurance/ Warranty/ Safety Program | 18,197.50 | - | 18,197.50 | | 18,197.50 | 100% | - | 1,819.75 |
| 18 | General Conditions/ GRs/ Supervision/ PM | 10,554.55 | - | - | - | - | 0% | 10,554.55 | - |
| 19 | Overhead/ Fee | 133,206.40 | - | - | - | - | 0% | 133,206.40 | - |
| 20 | Environmental Testing | 3,789.00 | - | 3,789.00 | - | 3,789.00 | 100% | - | 378.90 |
| 22 | Utility Connections | 2,500.00 | | 2,500.00 | - | 2,500.00 | 100% | - | 250.00 |
| Grand Total | | 2,201,897.19 | $0.00 | $244,675.50 | $183,137.00 | $427,812.50 | 19% | $1,774,084.69 | $42,781.25 |

Thank you,

Charlie Lehmann

**Construction Closing Specialist**

O. 910.807.7332 | M. 919.323.6064 | F. 910.679.0185

1741 Tiburon Drive | Wilmington, NC 28403



www.liveoakbank.com

Good Afternoon!

Docusign Envelope ID: 71C02B62-S8E6-8616-8205-FBA4AAB5B32D

I apologize for the delay in getting back to you; it has taken some time with vendors and people being out for the holidays and such.  But we have finally gotten everything together for your review.

I have attached the AIA Document and a cover letter explaining the charges listed on the AIA.

In addition, the link below is the documents for backup.

https://www.dropbox.com/sh/va3gdov5d8jc64o/AAATeYayQ46kTDiJv2wcH2a9a?dl=0



## Union City Pay App #1 with Backup

Shared with Dropbox

www.dropbox.com

Please let us know if you have any questions and if we need to submit to the 3rd party or if your team will do that.

Thank you for all the help with everything.

Thank you,

Rori Bullis

Director of ReDevelopment

 C: 214-437-5370

Southern California

3040 Red Hill Ave., Costa Mesa CA 92626

Northern California

4400 Automall Pkwy, Fremont CA 94538

DISCLAIMER: This email and any files transmitted with it are confidential and/or proprietary to Live Oak Bank or its affiliates and are intended solely for the use of the individual or entity to whom they are addressed. This communication represents the originator's personal views and opinions, which do not necessarily reflect those of Live Oak Bank. If you are not the intended recipient, be advised that you have received this email in error, and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you received this email in error, please immediately notify postmaster@liveoakbank.com, permanently delete the e-mail and any attachments, and destroy all hard copies immediately.

Northern California

4400 Automall Pkwy, Fremont CA 94538