United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

31014 UNION CITY BLVD LLC, et al.,
Plaintiffs,

v.

LIVE OAK BANKING COMPANY,
Defendant.

Case No. 26-cv-03958-CRB

**ORDER GRANTING MOTION TO DISMISS**

Plaintiffs 31014 Union City Boulevard LLC and Union City Veterinary Corporation needed financing to construct a veterinary hospital in Albany, California. They ultimately secured a loan from Defendant Live Oak Banking Company. Alleging that Live Oak disbursed part of the loan without sufficient documentary support, Plaintiffs sued. Live Oak now moves to dismiss. For the reasons below, the Court **GRANTS** the motion.

## I. BACKGROUND

Plaintiffs are two California-based corporations. FAC (dkt. 1-1) ¶¶ 1–2. They entered into a loan agreement ("Agreement") with Live Oak to purchase a property and construct a veterinary hospital. Id. ¶¶ 6–7. The Agreement governed the parties' "loan relationship, including conditions to disbursement . . . and the construction draw and disbursement process." Id. ¶ 8. This process required Plaintiffs and their contractor to submit loan disbursement requests to Live Oak. Spooner Decl. (dkt. 6-1), Ex. A § 9.4.[1]

[1] The parties agree that the Agreement in its entirety is incorporated by reference into the complaint. See Opp'n (dkt. 17) at 4 n.1; Mot. at 6–7; see Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018) (documents that "form the basis of the complaint" may be considered when deciding motions to dismiss).

Upon the receipt of a valid disbursement request, Live Oak was obligated to disburse the funds to the contractor. Id.; FAC ¶ 11. The Agreement gave Live Oak discretion in its approval of disbursements and explicitly barred any party from relying on its exercise of this discretion.[2] Spooner Decl., Ex. A §§ 9.4, 9.13.

Plaintiffs eventually entered into a construction contract with a general contractor. Id. ¶ 12. Live Oak appointed a construction specialist, Charlie Lehmann, "to oversee certain aspects of the Project and associated loan funding including, without limitation, [the contractor's] satisfaction of documentary support requirements." Id. ¶ 26. On or about December 22, 2022, Lehmann made certain assurances to Plaintiffs regarding the disbursement process, including remarks that (1) "we are keeping you all in mind by requesting these backup items to confirm pricing for [disbursements that are] being requested" by the contractor, (2) that Live Oak would "make sure everything is accurate" under the Agreement, and (3) that payment would only be issued "for work actually completed or materials already ordered by [the contractor], with adequate supporting documentation." Id. ¶ 28.

Shortly thereafter, the contractor submitted a payment application ("Payment Application") to Live Oak. Id. ¶ 14. The Payment Application requested Live Oak's approval of a $385,031.25 disbursement to the contractor, which included a $220,189 charge for "mobilization costs." Id. On January 23, 2023, Lehmann submitted the Payment Application to Plaintiffs for approval over email.[3] Id. ¶ 29. The full email reads:

[2] Plaintiffs allege that the U.S. Small Business Association ("SBA") 7(a) Loan Authorization establishes separate duties for Live Oak and is "incorporated" into the parties' Agreement. FAC ¶¶ 9–10. Accordingly, the Court considers it under the incorporation-by-reference doctrine because its contents "form the basis of the complaint." See Khoja, 899 F.3d at 1002. However, the SBA authorization explicitly states that it is "between Lender and SBA and creates no third party rights or benefits to Borrower," and therefore does not create separate duties for Plaintiffs' benefit. Spooner Decl., Ex. B at 12.

[3] Quotations from the January 23 email undergird all of Plaintiffs' misrepresentation-based claims. See FAC ¶ 29. Accordingly, the email can be incorporated by reference. See Khoja, 899 F.3d at 1002. Despite Plaintiffs' argument otherwise, the Court can assume the full contents of the email to be true while still accepting the complaint's other factual allegations—including Lehmann's assertions on December 22, 2022—as also true. See id. at 1003. The Court therefore rejects Plaintiffs' attempt to selectively quote only the portions of the email that are favorable to their position. See id. at 1002 ("The [incorporation-by-reference] doctrine prevents plaintiffs from

United States District Court
Northern District of California

> Good Afternoon Dr. Chen,
>
> Hope you all are doing well! Wanted to follow up on the below email and get your approval on releasing funds to [the contractor] for the attached billing? We received the majority of backup documents we were looking for.
>
> We did want to make sure you all were aware of the mobilization line item being billed for $220,189.00. This is higher then [sic] we typically see mobilization fees and wanted to get it on your radar for approval.
>
> This is the one item we did not receive too much backup documents for and just wanted you all to be aware.
>
> If you could approve/confirm total payment of $385,031.25 to [the contractor] for the attached we will work to get payment released. Please let me know if you have any questions at all. Thank you!

Spooner Decl., Ex. C at 1.

Following this request, Plaintiffs approved the Payment Application. FAC ¶ 23. Live Oak then disbursed the funds to the contractor. Id. Allegedly, when Live Oak sought this approval, it "knew documentary support for [the Payment Application] was insufficient to satisfy Live Oak's own internal disbursement policy." Id. ¶ 33. The "mobilization" costs were ultimately not authorized under the contract with the contractor. Id. ¶ 31.

On or about July 3, 2024, Plaintiffs reached out to Live Oak for "documentation and information related to [the Payment Application]." Id. ¶ 45. Live Oak refused—asserting that the information was confidential—and denied responsibility for any discrepancy in documentation. Id. ¶¶ 46, 48. Live Oak also sent Plaintiffs a proposed modification agreement ("Modification") in connection with the sale of the property. Id. ¶ 53. Despite Live Oak's presentation of the Modification as "merely an administrative document," the Modification "contained expansive release language whereby Plaintiffs would functionally waive and release Live Oak from any defenses, offsets, or claims—whether known or unknown—arising from the Loan Agreement, loan servicing, or prior conduct of Live Oak." Id. ¶ 55. Plaintiffs ultimately rejected the Modification due to the release of liability language and "the fact that Live Oak was requesting that Plaintiffs backdate the

---

selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.").

Modification." Id. ¶ 56.

Plaintiffs now bring five claims against Live Oak: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, and (5) violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). Live Oak moves to dismiss for a failure to state a claim. Mot. (dkt. 6).

## II. LEGAL STANDARD

Under Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. The Court may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (citation modified). A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation modified). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. Id. (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)). When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. 15(a)(2). A court may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant,

United States District Court
Northern District of California

repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

The Court first interprets the terms of the Agreement as a matter of law. The Court then uses this interpretation to evaluate whether Plaintiffs sufficiently state any of their claims. As explained below, the Court dismisses all of Plaintiffs' claims.

### A. Terms of the Agreement

The Court determines as a matter of law that under the Agreement (1) Live Oak had discretion on how to evaluate the sufficiency of documentation before disbursement application approval, and (2) Plaintiffs had no right to rely on Live Oak's approvals as an indication of the legitimacy or sufficiency of the underlying application.

Under North Carolina Law, "the interpretation of an unambiguous contract is a matter of law for the court to determine." Brown v. Scism, 274 S.E.2d 897, 901 (N.C. 1981).[4] However, if the contract language is susceptible to more than one reasonable interpretation, a court must draw inferences in favor of the non-moving party at the motion to dismiss stage. See, e.g., AC Devs., LLC v. Edwards, 919 S.E.2d 762, 765 (N.C. Ct. App. 2025) ("If a contract is ambiguous, its interpretation is a question of fact."). When interpreting contracts, courts must "give effect to the plain and unambiguous language." Am. Nat. Elec. Corp. v. Poythress Com. Contractors, Inc., 604 S.E.2d 315, 317 (N.C. Ct. App. 2004) (internal citation omitted). The language must also be "harmoniously construed" to give effect to "every word and every provision" in the contract. Singleton v. Haywood Elec. Membership Corp., 588 S.E.2d 871, 875 (N.C. 2003) (quoting Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 524 S.E.2d 558, 563 (N.C. 2000)).

Plaintiffs assert that Live Oak had a duty "to ensure certain documentary and other requirements were met" before issuing a disbursement. See Opp'n at 7. But the

[4] Due to a choice-of-law provision in the Agreement, the parties apply North Carolina law. See Mot. at 3 n.2; see generally Opp'n. The Court will as well.

United States District Court
Northern District of California

Agreement says otherwise. Live Oak had discretion in deciding how much paperwork it required before approving disbursements under the Agreement. Its obligation to make a Loan Disbursement was "subject to the fulfillment to [its] satisfaction of all of the conditions set forth in this Agreement and in the Loan Documents." See Spooner Decl., Ex. A § 9.4 (emphasis added). This means that Live Oak's duty did not extend beyond completing its own discretionary review of disbursement applications. See Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 781 S.E.2d 1, 8 (2015) ("In an ordinary debtor-creditor transaction, the lender's duties are defined by the loan agreement and do not extend beyond its terms."). Plaintiffs all but admit this by saying that "Live Oak retained 'sole and absolute discretion' in this process." See Opp'n at 10 (citing Mot. at 21) (emphasis in original).

In addition, the plain text of Section 9.13, entitled "Limitation of Lender Responsibility," unambiguously prevents Plaintiffs from relying on Live Oak's decision to issue a disbursement. The relevant text reads:

> "Neither Borrower nor the General Contractor or any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Disbursement. The making of any Disbursement by Lender shall not constitute or be interpreted as either (i) an approval or acceptance by Lender of the work done through the date of the Disbursement; or (ii) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract."

Spooner Decl., Ex. A § 9.13.

This bars Plaintiffs from relying on Live Oak's approval of the Payment Application.[5] Nevertheless, Plaintiffs argue that the meaning of "appropriateness" is ambiguous within Section 9.13. Opp'n at 5. Specifically, they contend that this language

[5] The Court does not endorse Live Oak's interpretation that "any approvals are 'solely for the protection of Lender's interests' and impose 'no responsibility or liability' on Live Oak to any party." See Mot. at 8 (quoting Spooner Decl., Ex. A § 9.13). This language only applies to approvals of "the Construction in accordance with the Plans and Specifications," which do not necessarily overlap with approvals of disbursements. See Spooner Decl., Ex. A § 9.13 (emphasis added).

only applies to Live Oak's final decision to issue a disbursement, but not its process of reaching that decision. Id. at 5–6. But the plain language encompasses Live Oak's determination of what is or is not appropriate when it comes to disbursements. This cannot be reasonably read to exclude the process by which Live Oak makes decisions leading up to the ultimate disbursement. See Spooner Decl., Ex. A § 9.13. This interpretation also makes sense within the context of the entire Agreement: Section 9.4 gives Live Oak discretion to decide when it has sufficient documentation to approve a disbursement, while Section 9.13 prevents any party from relying on the exercise of this discretion. See id. §§ 9.4, 9.13.

However, the Court does not endorse Live Oak's argument that all duties related to reviewing disbursement documentation fall "solely on [Plaintiffs]." See Mot. at 11. While it is true that the Agreement explicitly assigns Plaintiffs the duty of submitting disbursement applications "with respect to work actually completed," it also requires Live Oak to review the documentation submitted and issue a disbursement if that documentation is "satisfactory." See Spooner Decl., Ex. A § 9. This distinguishes the Agreement here from the contract in Lassiter v. Bank of N.C., where a lender's right to inspect was only permissive. See 551 S.E.2d 920, 923–24 (N.C. Ct. App. 2001).

### B. Plaintiffs' Claims

Plaintiffs assert claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, and (5) a UDTPA violation. For the contract-based claims, the Court determines that Plaintiffs fail to plead that Live Oak breached any duty assigned in the Agreement. The Court then concludes that Plaintiffs' claims based on misrepresentation fail to establish reasonable reliance. As a result, the Court dismiss all of Plaintiffs' claims.

#### 1. Breach of Contract

For a breach of contract claim under North Carolina law, a plaintiff must allege "(1) the existence of a contract between the parties, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the damages resulting to the plaintiff from the

United States District Court
Northern District of California

breach." Thompson v. Bass, 819 S.E.2d 621, 625–26 (N.C. Ct. App. 2018). Live Oak only argues that "no specific contractual requirement was violated." Mot. at 11.

Live Oak is correct because the terms of the Agreement directly contradict Plaintiffs' allegations of breach. Plaintiffs argue that Live Oak agreed to make disbursements "for work actually completed" and that Sections 9.4 and 9.5 "plainly set forth [this] requirement." See Opp'n at 8. But this is not true. As discussed above, Section 9.4 only requires Live Oak to approve disbursements that it deems "satisfactory," and gives it discretion in how to do so. See Spooner Decl., Ex. A § 9.4. Section 9.13 prevents Plaintiffs from relying on the exercise of this discretion and explicitly notes that disbursements are not meant to be "an approval . . . of the work done." See id. § 9.13. And Section 9.5 does not say otherwise. See id. § 9.5 ("Lender shall make a Disbursement within ten (10) business days following its receipt of an approved Draw Request along with all supporting documentation required by this Agreement.").

Plaintiffs therefore fail to state a breach of contract claim because Live Oak's decision to issue a disbursement with minimal supporting documentation did not breach any specific provision under the Agreement. See Thompson, 819 S.E.2d at 625 ("In an action for breach of contract, the complaint must allege . . . the specific provisions breached."). Live Oak's duty under the Agreement only goes so far as to require that it deem payment applications satisfactory before issuing disbursements. See Spooner Decl., Ex. A § 9.4. And the limitation on liability in Section 9.13 only further undermines Plaintiffs' position.

Plaintiffs' alternative theory also fails. Plaintiffs argue that Live Oak breached by "revers[ing] the contractual process: rather than receiving a joint submission from Plaintiff and [the contractor] and then deciding whether to approve the disbursement, Live Oak received a submission from [the contractor] alone . . . and then presented the application to Plaintiff for after-the-fact ratification." Opp'n at 8. But this also does not constitute a breach. The Agreement only requires both Plaintiffs and the contractor to "complete, execute, and deliver . . . [an application for disbursement] in form and substance

satisfactory to the Lender." Spooner Decl., Ex. A § 9.4. Plaintiffs ultimately sent Live Oak their approval of the disbursement application in a form "satisfactory to the Lender." This means that Live Oak fulfilled its obligations under the contract. See id. § 9.5 ("Lender shall make a Disbursement . . . following its receipt of an approved [Payment Application] (emphasis added)); Reply (dkt. 20) at 6.

Because Plaintiffs failed to allege Live Oak breached any of the terms of the Agreement, the Court dismisses this claim with prejudice, as amendment would be futile.

**2. Good Faith and Fair Dealing**

Plaintiffs' failure to plead a valid breach of contract claim is also fatal to their good faith and fair dealing claim. Under North Carolina law, every contract contains an implied covenant of good faith and fair dealing that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, S.E.2d 299, 305 (N.C. 1985) (internal citations omitted). "As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, [courts] treat the former claim as 'part and parcel' of the latter." Cordaro v. Harrington Bank, FSB, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018).

Here, Plaintiffs' good faith and fair dealing claim is based on the exact same conduct as their breach of contract claim. FAC ¶¶ 7–24. Because Plaintiffs failed to allege a breach of any contractual duty, they fail to show a breach of the implied covenant of good faith and fair dealing. See Cordaro, 817 S.E.2d at 256 (dismissing good faith claim because it was based on the same premise as a dismissed breach of contract claim). Plaintiffs cannot base their good faith claim on Live Oak's "abuse of discretion" in administering the loan disbursement when Live Oak is alleged to have administered the Agreement in accordance with its terms. See Opp'n at 9; see also Maglione v. Aegis Fam. Health Ctrs., 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) (no breach of the implied covenant of good faith and fair dealing if the breach conflicts with the express terms of a contract). Plaintiffs similarly cannot allege that they were induced into approving the disbursement

United States District Court
Northern District of California

application. See FAC ¶ 23. This is because (1) they had an independent duty under the Agreement to ensure the payment application was correct, (2) they had no "right to rely" on Live Oak's determination, and (3) Lehmann explicitly flagged the minimal documentary evidence related to the Payment Application. See Spooner Decl., Exs. A §§ 9.4, 9.13; C at 1.

Accordingly, Plaintiffs' good faith and fair dealing claim must be dismissed with prejudice to the extent it is based on the terms of the Agreement alone. Amendment may not be futile if Plaintiffs can allege other conduct outside the four corners of the Agreement that plausibly frustrated the contract's purpose.

**3. Fraud**

Live Oak argues that dismissal of Plaintiffs' fraud claim is appropriate because Plaintiffs (1) fail to meet the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b), (2) fail to plead actionable misrepresentation, and (3) fail to plead justifiable reliance. Mot. at 13–15. The Court bases dismissal on Live Oak's third point.

Although there is no "all encompassing" definition of fraud, the North Carolina Supreme Court has held that the "following essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injury [sic] party." Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974).

Plaintiffs argue that fraud occurred through Live Oak's presentation and submission of the Payment Application, as well as the assurances Lehmann offered to Plaintiffs in December 2022. Opp'n at 11. However, the Agreement's plain language, combined with the full text of the January 23 email, bar Plaintiffs from justifiably relying on any of Live Oak's conduct or omissions.

**a. Payment Application**

As discussed, the Agreement establishes that Plaintiffs had no "right to rely" on Live Oak's determination of the appropriateness of any disbursement. See Spooner Decl.,

United States District Court
Northern District of California

Ex. A § 9.13. This specifically bars Plaintiffs from relying on Live Oak's presentation of the Payment Application to them as appropriate. See, e.g., Greer v. Advanced Equities, Inc., 964 N.E.2d 772, 775 (Ill. App. Ct. 2012) ("[I]t is hardly justifiable for someone to rely on something that they have agreed not to rely on.").

The full text of the January 23 email independently prevents Plaintiffs from pleading justifiable reliance. Plaintiffs allege that Live Oak "expressly indicated that . . . [the contractor] had submitted adequate documentary support for" the Payment Application and presented it in "a manner that conveyed compliance and verification, when such review had not occurred." FAC ¶¶ 30, 32. But the full text of the email reveals that Lehmann specifically flagged that the mobilization line item was "higher then [sic] we typically see mobilization fees" and that that item "did not receive too much backup documents." Spooner Decl., Ex. C at 1.

**b. Lehmann's Assurances**

Plaintiffs also fail to allege reasonable reliance on the alleged December conversation with Lehmann. During this conversation, Plaintiffs allege that Lehmann informed them that Live Oak would "make sure everything is accurate" and that "payment would only be issued for work actually completed or materials already ordered . . . with adequate supporting documentation." See FAC ¶¶ 5–6.

The full text of Lehmann's subsequent email is sufficient to defeat Plaintiffs' alleged reliance on Lehmann's statements. "[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." Hudson-Cole Dev. Corp. v. Beemer, 511 S.E.2d 309, 313 (N.C. Ct. App. 1999). Plaintiffs fail to do so here and therefore do not plead reasonable reliance.

The January 23 email explicitly flagged the documentation irregularity, putting Plaintiffs on notice about issues with the Payment Application. See Spooner Decl., Ex. C at 1. The email also ended with an invitation to follow up with "any questions at all,"

giving Plaintiffs an opportunity to investigate the issue further. See id. Given this notice, Plaintiffs have not plausibly alleged that they were "induced to forgo additional investigation by defendant's misrepresentations." See Opp'n at 11–12 (quoting Hudgins v. Wagoner, 694 S.E.2d 436, 445 (N.C. Ct. App. 2010)).

Accordingly, Plaintiffs' fraud claim is dismissed.

**4. Negligent Misrepresentation**

The Court also dismisses Plaintiffs' negligent misrepresentation claim because Plaintiffs cannot show justifiable reliance, as discussed above. See Simms v. Prudential Life Ins. Co. of Am., 537 S.E.2d 237, 240 (N.C. Ct. App. 2000) (justifiable reliance is a required element of a negligent misrepresentation claim).

This claim is also barred under the economic loss rule. See Boone Ford, Inc. v. IME Scheduler, Inc., 822 S.E.2d 95, 99 (N.C. Ct. App. 2018) ("Recovery in tort arising out of a breach of contract is generally barred by North Carolina's economic loss rule."). The economic loss rule bars tort claims that arise entirely from the breach of contractual duties. Van Camp v. Shaffner, No. COA25-813, 2026 WL 1236665, at *5 (N.C. Ct. App. May 6, 2026). This means that the misrepresentations related to Live Oak's approval and presentation of the Payment Application, which are fully encompassed by the Agreement, are barred by the economic loss rule. See id.; Spooner Decl., Ex. A §§ 9.4, 9.5, 9.13. Lehmann's alleged misrepresentations, even though they were made after the formation of the Agreement, are also barred because they were directly regarding the subject matter of the Agreement and are only linked to damages stemming from the approval and presentation of the Payment Application. See Spillman v. Am. Homes of Mocksville, Inc., 422 S.E.2d 740, 741–42 (N.C. Ct. App. 1992) (holding that "when the injury . . . is damage to the subject matter of the contract," a tort claim is barred by the economic loss rule).

Accordingly, the Court dismisses this claim with prejudice, as amendment would be futile.

**5. Unfair and Deceptive Trade Practices**

Plaintiffs also fail to state a claim under the UDTPA. For a UDTPA claim, "a

plaintiff must show: (1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." First Union Nat. Bank v. Brown, 603 S.E.2d 808, 818 (N.C. Ct. App. 2004). Live Oak argues that this claim fails because (1) Plaintiffs fail to plead reasonable reliance and proximate causation and (2) Live Oak had no duty to disclose documentation relating to the Payment Application.[6] Mot. at 19–21.

Plaintiffs cannot base their UDTPA claim on Live Oak's alleged misrepresentations leading up to the approval of the Payment Application because—for the same reasons discussed above—Plaintiffs cannot plead reliance. The North Carolina Supreme Court has clearly stated that "a claim under section 75–1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 226 (N.C. 2013). Because Plaintiffs have failed to plead reasonable reliance, they cannot base their UDTPA claim on their allegations of "misrepresentations about the status of documentation review" and "inducement to approve a disbursement on false pretenses." See Opp'n at 14.

Without the support of these misrepresentations, Plaintiffs' UDTPA claim fails. The only remaining bases for Plaintiffs' UDTPA claim relate to Live Oak's (1) failure to provide Plaintiffs information and documentation regarding the Payment Application and (2) presentation of a back-dated Modification that was "embedded with sweeping release language unrelated to the purported purpose of the Modification." FAC ¶¶ 45–51, 57.

The first point fails because Live Oak had no duty to disclose this information. "[A] lender does not generally owe its borrower a duty beyond the lender's contractual obligations." Arnesen, 781 S.E.2d at 6. However, a duty to disclose may arise from "a

[6] Live Oak also argues that Plaintiffs' UDTPA claim is barred under the economic loss rule. Mot. at 18. The Court disagrees because the UDTPA gives rise to a distinct and separate cause of action than the contract claim. See, e.g., Van Camp v. Shaffner, No. COA25-813, 2026 WL 1236665, at *7 (N.C. Ct. App. May 6, 2026) ("Plaintiff's unfair and deceptive practices claim is likewise not barred by the economic loss rule because it gives rise to a separate cause of action than his breach of contract claim.").

relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances." Kron Med. Corp. v. Collier Cobb & Assocs., Inc., 420 S.E.2d 192, 197 (N.C. Ct. App. 1992) (quoting Setzer v. Ins. Co., 126 S.E.2d 135, 137 (N.C. 1962)). None of these factors are present here. For starters, Live Oak and Plaintiffs had no fiduciary relationship. Spooner Decl., Ex. A § 8.13 (Live Oak had "no fiduciary or other special relationship with or duty to" Plaintiffs). Live Oak was also not required to share its own internal documents with Plaintiffs under the Agreement. See id. §§ 9.4, 9.5. In addition, Plaintiffs' request for documentation was not concurrent with the disbursement approval process, it came nearly a year after their own approval of the Payment Application. See FAC ¶¶ 29, 45. Consequently, Live Oak and Plaintiffs' relationship did not extend beyond an arms-length borrower-lender relationship in the context of the requests for documentation. See Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 264 (N.C. 2014) (holding that a borrower-lender relationship is typically arm's length "absent exceptional circumstances"). And Live Oak had no duty to disclose any of its internal documentation to Plaintiffs. See id. at 267 ("[T]he law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own.").

The second point fails because Plaintiffs do not sufficiently allege how the presentation of the Modification proximately caused any injury. Live Oak presented the Modification to Plaintiffs after the disbursement of the Payment Application had already been approved and issued. FAC ¶¶ 29, 53. Plaintiffs also ultimately rejected the Modification. Id. ¶ 56. This means that the Modification could not have caused any injury associated with the earlier approval and issuance of the Payment Application. Without a subsequent, separate injury, Plaintiffs' claim fails.

For the reasons above, this claim is dismissed. Given the Agreement's explicit bar on reliance, amendment will be futile for any part of the UDTPA claim based on misrepresentation related to the "Lender's determination of the appropriateness of any Disbursement." See Spooner Decl., Ex. A § 9.13. However, the Court grants leave to amend the UDTPA claim based on reliance for misrepresentations unrelated to the

disbursement process, or any other unfair or deceptive practice that proximately caused injury.

**IV. CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Live Oak's motion. Plaintiffs' claims are dismissed with prejudice where specified above. If they wish to file an amended complaint, Plaintiffs may do so within thirty days.

**IT IS SO ORDERED.**

Dated: August 18, 2026

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California